THE WASHINGTON BRIDGE COMPANY *against* THE STATE OF CONNECTICUT, on the relation of *Colborn* :

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

### IN ERROR.

In 1802, the General Assembly created a corporation for the purpose of erecting a permanent bridge over the *Housatonuc* river, at the former ferry-place on that river, between the towns of *Milford* and *Stratford*, below the port of *Derby*, which had been established by Congress as a port of delivery. By the charter, the company were authorized to collect certain tolls to reimburse the expense of building the bridge; and it was then provided, that as soon as such expense, with an interest thereon of twelve *per cent. per annum*, should be reimbursed from the tolls, the bridge and the rate of tolls should be subject to such order and regulations as the General Assembly should then think proper to make respecting them; but there was no reservation of power, by the General Assembly, to repeal, alter or modify the charter, except in that event, which has not transpired. Besides the building of the bridge and maintaining it in repair, the charter imposed other onerous duties upon the company, among which was the making of a suitable and convenient draw in the bridge over the channel of the river, of the width of thirty-two feet, for the passage of vessels, which should be permitted at all times to pass, toll-free. The company erected a bridge, which was afterwards carried away, by a flood. In 1808, the General Assembly, by an additional resolution, which was accepted by the company, relieved them from some burdens previously imposed, made their grant exclusive within the distance of six miles on the river, and then added a proviso, that nothing therein contained should be so construed as to impair the rights, privileges and immunities of persons using and navigating said river. The company rebuilt their bridge and kept it in repair, complying with the terms of their grant, until 1845, when the General Assembly, on a petition of individuals served upon the company, passed a resolution, requiring the company to make, and thereafter to maintain in good repair, a good and sufficient draw, with the requisite piers, in some convenient place in the channel of said river, not exceeding fifty feet in width, so as to admit the free and easy passage of all registered or licensed vessels, whether navigated by sails or by steam, which should have occasion to pass and repass through the same—the draw to be commenced and completed under the direction and to the acceptance of commissioners, and within such time as they should limit; and it was further provided, that if the company should neglect to comply with these requirements, the owner of any registered or licensed vessel which should be delayed or detained, by the insufficiency of the draw, should recover of the company the amount of damages sustained thereby, and no tolls should thereafter be collected on the bridge until the draw should be completed to the acceptance of the commissioners. On an information in the nature of a *quo warranto*, against the company, alleging a non-compliance with the requirements of this resolution, in consequence of which a large class of the vessels duly registered and licensed to carry on commerce, and which were best adapted for that purpose, were obstructed and prevented from proceeding in their lawful voyages to said port of delivery, it was held, 1. that the charter of this company was a

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State

contract, protected from invasion, by the constitution of the *United-States ;* 2. that the resolution of 1808 reserved no authority to the legislature, without the assent of the company, to compel the construction of a draw fifty feet wide, in lieu of the former one ; 3. that, as the case showed that no such authority was reserved in the original charter, the company had not subjected themselves to a forfeiture of their chartered rights, by disregarding the resolution of 1845.

THIS was an information in the nature of a *quo warranto,* filed by the state's attorney for *Fairfield* county, on the relation of *Sullivan M. Colborn,* against the *Washington Bridge Company.*

The information alleged, that in the year 1799, Congress, pursuant to the constitution of the *United States,* which empowers that body " to regulate commerce with foreign nations and among the several states," constituted the port of *Derby,* situated on the navigable waters of the *Housatonuc* river, a port of delivery, annexed to the collection district of *New-Haven,* which has ever since continued to be and still is such ; that said navigable waters are an arm of the sea, where the tide ebbs and flows, communicating with the waters of the *Atlantic* ocean in *Long-Island* sound ; and that said river could be conveniently navigated to and from said port of delivery, by vessels of every description, duly licensed or registered, under the constitution and laws of the *United States,* to carry on commerce among such states or with foreign ports, but for the obstructions about to be mentioned. The information then set forth the charter of incorporation of the *Milford and Stratford Bridge Company,* afterwards named the *Washington Bridge Company,* passed in 1802, and sundry subsequent resolutions ; (*a*) all of which were accepted by the defendants.

By the original charter, the defendants were authorized to build a permanent bridge across the *Housatonuc* river, at or near the ferry-place between the towns of *Milford* and *Stratford,* which was below said port of delivery, with the right of reimbursing the expense thereof, by tolls to be collected from all persons passing said bridge. It was also provided, that before the company should be entitled to receive tolls they should pay to the town of *Stratford* and also to *Joseph Hopkins,* for the discontinuance of the ferry, from

(*a*) See *Priv. Stat.* 288-292.

the time the bridge should be completed to the rising of the General Assembly in 1806, such damages as should be assesssd to them respectively, by a committee appointed for that purpose; and that said company should make in said bridge, over the channel of the river, a suitable and convenient draw, of the width of thirty-two feet, for the passage of vessels; that piers should be extended eighty feet above and eighty feet below the bridge, with suitable spiles for securing said vessels and warping them through said draw; that all vessels should be permitted, at all times, to pass said draw, without payment of toll, and suitable persons should be provided by said company, to open and shut the same, on due notice of the approach of any vessel; that two lamps should be kept at such draw, during every night when vessels can navigate the river, unless the moon should give sufficient light; that in case any bars should be formed in the channel of the river, in consequence of erecting the bridge, so that the navigation of the river should thereby be obstructed more than it had previously been, it should be the duty of the company to remove such obstructions; and that said company should, at all times, at their own expense, keep said bridge in good repair, so long as they should receive the prescribed tolls.

By the same charter it was provided, that as soon as the tolls should reimburse to said company the sums by them advanced in building, or rebuilding, or repairing said bridge, expense of committee and clearing the channel, if it should become necessary, with an interest of twelve *per cent. per annum* on the same, said bridge and the rate of tolls should be subject to such order and regulations as the General Assembly should then think proper to make respecting the same; but neither in the original charter, nor in any of the subsequent acts or resolutions, was there a reservation of power, by the General Assembly, to repeal, alter or modify the grant, in any other event. There was no allegation in the information that that event had taken place.

A bridge was errected by the defendants, pursuant to their charter, which was afterwards carried away by the ice. Upon application made by them to the General Assembly, at its session in *May* 1807, liberty was granted to them to raise, by a lottery, the sum of forty thousand dollars, to be

*Fairfield, June, 1846.*

Washington Bridge Company *v.* The State.

*Fairfield.*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

laid out in building a bridge, on stone abutments and stone piers, across the river where the former bridge was built. In *May*, 1808, the General Assembly released the defendants from the obligation thus imposed on them to build the bridge on stone abutments and stone piers, and then provided, that no bridge should thereafter be erected across said river within six miles of the one to be rebuilt, during the time the defendants were authorized to keep up their bridge and receive tolls thereon, so as to interfere with the grant to them; provided that nothing therein contained should be so construed as to impair the rights, privileges and immunities of persons using and navigating said river.

The information further alleged, that the defendants having erected and rebuilt a bridge, at the place specified in their charter, and having maintained it until *May* 1845, the General Assembly, at its session in that year, passed an additional resolution, requiring the *Washington Bridge Company* to make, and thereafter to maintain in good repair, a good and sufficient draw in said bridge, with the requisite piers, in some convenient place in the channel of said river, not exceeding fifty feet in width, so as to admit the free and easy passage of all registered or licensed vessels, whether navigated by sails or by steam, which should have occasion to pass and repass through the same; the draw to be commenced and completed under the direction and to the acceptance of certain commissioners, within such time as they should limit. By this resolution, it was further provided, that if said company should neglect or delay to commence and complete said draw, after reasonable notice and request from said commissioners so to do, and it should happen that any duly registered or licensed vessel, having occasion to pass up or down said river through the draw in said bridge, should be delayed or detained, or should suffer damage in so doing, by reason of the insufficiency of said draw, the owner or owners of such vessels should recover of said company the amount of damage which he or they should have sustained thereby, before any court proper to try the same; and that no tolls should thereafter be collected on said bridge, until said draw should be made and completed to the acceptance of said commissioners. The information then alleged, that the commissioners limited and appointed the 25th day of *September*, 1845, for

the completion, by said company, of a draw in said bridge fifty feet in width, and gave reasonable notice thereof to said company; yet that said company utterly neglected and refused to make said draw, and disregarded said resolve of the General Assembly and the requirements of the commissioners; that the draw in said bridge is but thirty-two feet wide, and by reason of the narrowness of the same, a large class of the vessels duly registered and licensed under the constitution and laws of the *United States* to carry on commerce, which vessels require a greater width of passage than said draw affords, and are best adapted for carrying on commerce to and from said port of delivery, then were, and for a long time past had been, obstructed and prevented from proceeding in their lawful voyages and commerce to said port of delivery, as they otherwise might and would have done, if said company had complied with said resolution of 1845; and that, by reason of these facts, said company, on said 25th of *September* 1845, forfeited all their chartered rights, privileges and franchises, as a body politic and corporate; that notwithstanding such forfeiture, the defendants have since, without legal warrant, authority or power, continued to exercise the powers, privileges and franchises of a body politic and corporate, and have continued to maintain their bridge across said river, and a toll-gate at or near the same, and to collect tolls of the good people of this state having occasion to pass thereon; and so the defendants have usurped, and still do usurp, the powers, privileges and franchises granted by their charter; to the great damage of the good people of this state, and of the relator, and in violation of their rights and against the peace.

To this information there was a general demurrer; and the court adjudged it sufficient. The defendants, by motion in error, thereupon brought the record before this court for revision.

*Bissell* and *Loomis*, for the plaintiffs in error, contended, 1. That the *Washington Bridge Company*, on the 25th of *September* 1845, and when the resolution of *May* 1845 was passed, was a legally constituted and existing body politic and corporate, duly exercising the powers granted by the act of incorporation and the subsequent resolutions of the General

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

*Fairfield,*
June, 1846

Washington
Bridge
Company
*v.*
The State.

Assembly of this state. In the first place, this appears to be true in point of fact, and is admitted by the information, if the legislature could rightfully grant those powers. Secondly, the right and power to make the grant existed in this state, and in the other states of the *Union*, by virtue of their original sovereignty. *The People* v. *Rensselaer and Saratoga R. R. Co.* 15 *Wend.* 113. 132. Thirdly, the necessity of the case requires the exercise of this power, inasmuch as there is no such power in the general government. Fourthly, the power in question has been exercised by the states, by an uninterrupted course of legislation for the period of half a century. Among the bridges erected by legislative authority, over navigable waters below a port of delivery, are those at *Kittery, Me.*, at *Portsmouth, N. H.*, the *Charles River* and the *Warren* bridges, at *Boston, Mass.*, at *Hartford, Ct.* &c Fifthly, this legislation by the states, has been acquiesced in, by the general government. Sixthly, the judicial decisions, so far as they go, recognize these bridges as constitutional and legal. *Piscataqua Bridge* v. *New-Hampshire Bridge* & al. 7 *N. Hamp. R.* 35. 61, 2, 3. *Commonwealth* v. *Charlestown*, 1 *Pick.* 180. 184. *Commonwealth* v. *Breed*, 4 *Pick.* 460. *Charles River Bridge* v. *Warren Bridge*, 7 *Pick.* 445. *Livingston* v. *Van Ingen*, 9 *Johns. R.* 507. *Lansing* v. *Smith*, 8 *Cowen*, 146. *Kellogg* v. *Union Company*, 12 *Conn. R.* 7. *Enfield Toll Bridge Company* v. *Hartford and New-Haven R. R. Co.* 17 *Conn. R.* 64.

2. That the General Assembly had no constitutional power to interfere with the franchise of the plaintiffs in error, without their consent, unless upon adequate compensation, until their expenditures had been fully reimbursed. Neither the original charter, nor the subsequent resolutions of the General Assembly, contain any reservation of power, express or implied, to repeal, alter or amend the franchise of this company, except in the event referred to; which, it is admitted, has not occurred. *Commonwealth* v. *Breed*, 4 *Pick.* 460. *Hartford Bridge Company* v. *East-Hartford*, 16 *Conn. R.* 149. 174, 5. *Enfield Toll Bridge Company* v. *Hartford and New-Haven R. R. Co.* 17 *Conn. R.* 40. 59.

3. That the information is insufficient for want of an allegation that any duly registered or licensed vessel has been delayed or has suffered damage; upon which contingency alone the penalty of the law of 1845 attaches.

4. That if the law of 1845 is constitutional and valid, and the plaintiffs in error have failed to comply with its requirements, in consequence of which the injury intended to be guarded against has resulted, still the consequence is not a forfeiture of the charter. The law of 1845 is to be enforced, if at all, by its own sanctions, *viz.* a suspension of tolls until the draw shall be made and completed to the acceptance of the commissioners. No greater or other penalty than this can be inflicted.

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

*R. I. Ingersoll* and *Butler,* for the defendant in error, after remarking, that the case shows, that there was not merely a detention or delay of the vessels in reaching their port of delivery, while going through " a suitable and convenient draw," but that they were actually *shut out* from the port—" *prevented* from proceeding in their lawful voyages ;" and this, not as to a single vessel or a few only, but as to a large class, and those best adapted to the trade; contended, 1. That the defendants below had no right, by virtue of their original charter of 1802, to shut out this large class of vessels and break up their voyages. The *intention* of the makers of a statute is to be pursued in the construction of it, and may be collected from the cause and necessity of making it, as well as from other circumstances. 1 *Sw. Dig.* 11. Judges are to look at the language of the whole act, and if they find, in any particular clause, an expression not so large and extensive in its import as those used in other parts of the act, and upon a view of the whole act, they can collect from the more large and extensive expressions used in other parts, the real intention of the legislature, it is their duty to give effect to the larger expression. *Dwar. Stat.* 704. *United States* v. *Freeman,* 3 *Howard,* 556, 565. It would be doing injustice to the General Assembly of 1802, to suppose, that they intended their grant to the company to be in subversion of, instead of subordinate to, the act of Congress, which had been passed three years previously, and which was then before them. The language they have used, taking it all together, and giving effect to the larger expressions, warrants no such conclusion. The charter authorizes the company to build a bridge, with a draw in it ; but this is not all ; it requires of them to have " a *suitable* and *convenient*" draw. Suitable and convenient for

*Fairfield,*
June, 1846.
———
Washington
Bridge
Company
*v.*
The State.

what? The charter itself tells us, "for the passage of vessels." What vessels? The charter answers this question also; "all vessels," and at "all times," toll-free. True, it says, the draw shall be "of the width of thirty-two feet." But this, taken in connexion with the larger expressions used, and the paramount object to accommodate all, at all times, must be intended to mean the *minimum* with, not the *maximum*. The legislature do not say, that the draw shall not be of a greater width than thirty-two-feet. But even if there were ambiguity in the language used, this being the charter of a private corporation, the rules of construction require the court to construe it against the company, and in favour of the public. "Where there is any ambiguity found, the construction must be in favour of the public." *Dwar. Stat.* 749. "Every presumption is to be made against the company, and in favour of private property." *Dwar. Stat.* 751. In construing deeds of individuals, the language used is construed most strongly against the grantor; but the rule is different in regard to legislative acts. *Dwar. Stat.* 688–705. *Barrett* v. *Stockton and Darlington Railway Company,* 2 *Man. & Gran.* 134. (40 *E. C. L.* 298.) S. C. in err. 3 *Man. & Gran.* 956. (42 *E. C. L.* 496.) *Parkes* v. *Great Western Railway Company,* 7 *Scott N. R.* 835. *Thompson* v. *The People,* 23 *Wend.* 537. 11 *Pet.* 545. Nor can it be said, that "*all* vessels" must be intended to mean only the kind of vessels then known, *i. e.* sailing vessels, and not steamers. The latest improvement may be always used, though not in use at the time of the grant. *Bishop* v. *North,* 11 *Mees. & Wels.* 418. 425.

2. That the provisions of the resolution of 1808, accepted and acted on by the defendants below, are inconsistent with their present claim. The bridge having been carried away by a previous flood, and this arm of the sea being open to the freest navigation, the General Assembly, on the application of the company, in 1807, granted them a lottery, with liberty to raise therefrom 40,000 dollars to rebuild their bridge; and by an additional resolution in 1808, released them from some previous obligations and burdens resting upon them, and promised to permit no other bridge to be erected within six miles of the one to be rebuilt. Having done this, the General Assembly add the following important condition: "nothing

herein contained shall be so construed as to impair the rights, privileges and immunities of persons using and navigating said river." The company were then at liberty to reject the proffered aid, with the condition annexed to it, if they had seen fit. They might have declined the offer, and gone on to rebuild, with their own means, and under their original, unaltered charter. But they did not choose to do so ; they accepted the terms. The case shows, that the present bridge was rebuilt under the resolution of 1808 ; and the company, having availed themselves of the means thus conditionally furnished to rebuild their bridge, now claim, that they are authorized still to prevent a large class of vessels, and those best adapted to the business, from navigating the river. Is it so, that while the engagements of 1808 on the part of the state, are binding, the corresponding engagements of the company are to go for nothing ? It is said, however, that the resolution of 1808 authorizes the company to rebuild generally, under the same restrictions and conditions as are in the original act. They do so, but with this controuling proviso added ; that the authority thus to rebuild, with the means put at their disposal by the state, shall never be so construed as to impair the rights of navigation. This language of the proviso, to which the company have assented, must be satisfied. It cannot be rejected ; nor can it be construed in accordance with the claims of the company ; unless this court can say, that there are no rights of navigation that can be recognized in the owner of vessels of more than thirty-two feet breadth of beam ; and this too, when all the rules require us, as we have seen, to construe the charter strictly, as against the company, and liberally, as against the public.

3. That every citizen of the *United States* having a license for the coasting trade, has the right to deliver his cargo at the port of delivery. This was settled in the leading case of *Gibbons* v. *Ogden*, 9 *Wheat.* 1. 212. & seq. Now, when the owner of a vessel having this right by virtue of the license, is shut out from his port of destination, it is too plain to be argued, that his rights are impaired.

4. That these positions being established, it was the right and duty of the General Assembly, on finding that the company were so construing their charter as to impair the rights of navigation, to require them to act up to the spirit of their

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

contract, and permit all vessels, at all times, to go through. This was settled in *Bunnel* v. *East-Haven Bridge Company,* 4 *Conn. R.* 54. "The object of this visitorial authority," say the court, in that case, "is too apparent to admit of controversy : it is for the enquiry into and prompt correction of all abuses practiced by the company, under colour of their charter ; for directing an observance of the charter prescriptions ; and for compelling obedience to such directions. A construction which falls short of this, must presume that the legislative inspection, instead of usefully protecting and enforcing the rights of the public, was intended to be nugatory and inefficient." The proviso in that charter, was not half so strong and distinct as it is in this. Instead of a clear and ample reservation of the rights, privileges, and immunities of navigators, as we have here, it contained nothing but this : " always provided, that nothing in this grant shall operate to injure or affect the property of any individual, or of the proprietors of common and undivided lands in *New-Haven*, but the property and privileges of individuals, and said proprietors, are hereby saved." And yet that was held, by the supreme court of errors, to be sufficient to cover the rights of navigation.

5. That if the General Assembly had attempted to grant, what the defendants below claim was granted,—the right to shut out from this port of delivery a large class of registered and licensed vessels, that are, as the case finds, best adapted to carry on commerce, the grant would have been void, as coming directly in conflict with the constitution of the *United States*, and the laws of Congress. This has been placed beyond all controversy, by the decision in *Gibbons* v. *Ogden,* 9 *Wheat.* 1. 217. "If the power reside in Congress," say the supreme court, "their acts applying that power to vessels generally, must be construed as comprehending *all* vessels. If none appear to be excluded, by the language of the act, none can be excluded by construction." It matters not whether they are navigated, by means of the winds or by steam, nor how constructed ; for the court, in the same case, (*p.* 221.) say : "The one element may be as legitimately used as the other, for every commercial purpose authorized by the laws of the *Union ;* and the act of a state inhibiting the use of either to *any* vessel having a license under the act of

Congress, comes, we think, in direct collision with that act." Nor is it any answer, to tell us, that the state had made a contract with the company, which should be held inviolable. It is immaterial how the exclusion is effected, whether by means of a contract or otherwise. The state of *New-York* had made a contract with *Fulton* and *Livingston*, which excluded from her ports a certain class of vessels; but the exclusion was no less unconstitutional on that account. See also the doctrines of *Gibbons* v. *Ogden* commented on and enforced, in *Barque Chusan*, 2 *Sto. R.* 445. 465. *North-River Steam-Boat Company* v. *Livingston*, 3 *Cowen*, 713. *The People* v. *Saratoga and Rensselaer R. R. Co.* 15 *Wend.* 113. 131. & seq. *Savage*, Ch. J., giving the opinion of the court, says, (*p.* 132.) that any obstruction, at the place referred to, (an arm of the sea,) entirely preventing or essentially impeding the navigation, would be unlawful. Our own court, in *Kellogg* v. *The Union Company*, 12 *Conn. R.* 7. adopt substantially the same doctrine. The court, by *Bissell*, J. (*p.* 23.) speaking of certain state enactments, say : " They are mere municipal regulations, and whenever adopted, the question arises, and it is one to be settled by the judicial tribunals, whether they do in fact conflict with the laws of Congress. *If they do so conflict, they must undoubtedly yield.*"

6. That the remedy by *quo warranto* is the proper one. The action of the state, by the resolution of 1845, is sufficient to justify its officers in enforcing the requirements of the General Assembly ; and this court is bound, by the official oath of the judges, to "support the constitution of the *United States*," as well as the constitution of the state of *Connecticut.* It is no objection to this remedy, that the resolution of 1845 gives to each person injured redress by action. That remedy is merely *cumulative*, and does not affect the right to proceed by *quo warranto*. *The People* v. *Bristol and Rensselaerville Turnpike Company*, 23 *Wend.* 222. *The People* v. *Hinsdale and Chatham Turnpike Company, Id.* 254. *The People* v. *Kingston and Middletown Turnpike Company, Id.* 193. *Thompson* v. *The People, Id.* 537.

CHURCH, J. This information or writ of *quo warranto*, presented by the state's attorney against the *Washington Bridge Company*, is not prosecuted on the ground that the

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

*Fairfield,*
June, 1846.

Washington
Bridge
Company
*v.*
The State.

defendants' bridge is a public nuisance, obstructing the common and free use of the *Housatonuc* river, as a navigable stream; but the point of grievance complained of, is, that the *Washington Bridge Company* have disregarded a resolution of the General Assembly of *May* 1845, and have thereby forfeited their chartered rights. That resolve required the company to make and maintain in repair a good and sufficient draw, not exceeding fifty feet in width, and so as to admit the free and easy passage of vessels &c., to be commenced and completed under the direction and to the acceptance of commissioners, and within such time as they should limit; and directing, among other things, that no tolls should be collected until such draw should be thus made and completed.

This requires of us an opinion regarding the constitutional power of the legislature to pass the resolution referred to; for if no such power existed, a disobedience of its demands could not work a forfeiture of rights, nor incur any other penalty.

By the original charter of the company, no power was reserved by the legislature, to repeal, alter or modify it, nor to impose additional burdens upon the corporation, after they had complied with the terms prescribed by the grant, until they should be reimbursed their expenses in erecting the bridge &c., together with an interest of twelve *per cent.* thereon: an event which has not yet transpired.

That charter not only requires of the *Washington Bridge Company* to erect and keep in constant repair a costly structure, but also to remove obstructions in the river, as well as to pay the proprietors of the ancient ferry such compensation for the loss of their franchise as should be awarded to them. In return for all this, as a fair equivalent, the right to receive stipulated tolls was conferred. There is no principle of constitutional law or of morals, which can justify the exaction of other duties or the imposition of further burdens, without a further equivalent provided.

Ever since the case of *Dartmouth College* v. *Woodward* was decided, by the national court, recognizing the charters of private corporations as contracts protected from invasion by the constitution of the *United States*, no other court in this country has disregarded the doctrine; and we consider it now as obligatory and settled beyond our reach either to

deny or disregard, even if any of us should doubt its original propriety. The supreme court of the *United States* holds ultimate jurisdiction over constitutional questions growing out of the national constitution. Therefore, although it may be true, that to create a private corporation without a reserved legislative power over its charter, is an act of improvident legislation ; yet the judiciary has no remedial powers to apply.

<em>Fairfield,</em><br>June, 1846.<br>—————<br>Washington<br>Bridge<br>Company<br><em>v.</em><br>The State.

In the argument, it was pressed upon us, by the counsel for the relator, that the resolution of the General Assembly, passed on the subject of this bridge in 1808, and which was acquiesced in and accepted by the defendants, authorized the resolution of 1845. But, to give the resolve of 1808 all the effect which the relator can reasonably claim, it only secures the rights, privileges and immunities of persons using and navigating the river : it reserves no authority to the legislature, without the assent of the company, and without providing for compensation, to compel the construction of a draw in the bridge fifty feet wide, in the place of one thirty-two feet wide, as directed by the charter; nor that it be completed within any definite time. It leaves those whose rights of navigation it protects, and which may be impaired by the bridge, to such remedies as the law has provided.

We are constrained, therefore, upon this information, to say, that the *Washington Bridge Company* has not subjected itself to a forfeiture of its chartered rights, by disregarding the resolution of the General Assembly of 1845 ; and shall advise the superior court, that the information is insufficient. It will be perceived, that in coming to this result, we have not found it necessary to discuss several questions which were suggested in the argument ; as whether, or how far, the legislature can create a franchise which may conflict with the power of Congress to regulate commerce ; or whether the defendants can justify, under their charter, the continuance of the bridge in its present condition, if in fact it essentially hinders or obstructs the passage of vessels to and from a port of delivery above it ; nor what will amount to such an obstruction. Those questions have not passed without notice ; but we have not thought a decision of them to be necessary, in the present case.

In this opinion the other Judges concurred.