STATE *v.* THE RICHMOND AND DANVILLE RAILROAD CO. *et al.*

or severing from the realty, before the exact rights of the parties, under the contract, became ascertained and fixed.

The judgment of the Superior Court is reversed, the demurrer overruled, and the case remanded to the Superior Court to be proceeded in according to law.

PER CURIAM.                    Judgment reversed.

STATE *v.* THE RICHMOND & DANVILLE RAIL ROAD COMPANY, A. S. BUFORD and W. H. GREEN.

An indictment under the Act 1874–'75, Chap. CLIX, against the Richmond & Danville Railroad Company, (changing the gauge of railroads,) cannot be sustained, because that act impairs the obligation of the contract between the State and the defendant Railroad Company, as assignee of the North Carolina Railroad Company.

BYNUM, J., dissenting.

This was an INDICTMENT under the act of 1874–'75, for changing the gauge of the North Carolina Railroad, tried before *Watts, J.,* at June Term, 1875, of WAKE Superior Court.

The jury returned the following special verdict:

1. That the North Carolina Railroad Company was formed and organized by virtue of an act of the General Assembly of North Carolina, entitled "An act to incorporate the North Carolina Railroad Company," ratified the 27th day of January, 1849, and other subsequent acts amendatory thereof.

2. That said company did soon thereafter construct its railroad from Charlotte to Neuse river, and operate the same with steam power. That the track of the said railroad so constructed was of the uniform gauge and width of four feet, eight inches and one-half of an inch, throughout its entire length and has so remained until the day hereinafter mentioned.

3. That the Richmond & Danville Railroad Company, a

corporation formed, organized and existing under the laws of the State of Virginia, came into the possession on the 11th day of September, 1871, of the tract, road bed, engines, locomotives, coaches, &c., belonging to the said North Carolina Railroad Company, and of its rights, franchises and other property of the said company, under a contract of lease entered into between said corporations.

4. That the Richmond & Danville Railroad Company claimed by said contract to have the right to change the gauge of the said North Carolina Railroad tract, and being about to do so, were enjoined from so doing in an action wherein the State of North Carolina was plaintiff and the said railroad companies were defendants, which said suit was ultimately determined at January Term, 1875, of the Supreme Court of North Carolina, the record of which is to be considered as a part of this verdict.

5. That the North Carolina Railroad Company is a corporation existing by virtue of the laws of North Carolina, with a President and Board of Directors, but that the officers of said corporation had nothing to do with the change of the gauge of the North Carolina Railroad Company and had no control over the management of running trains over said road.

6. That Algernon S. Buford is the President of the said Richmond & Danville Railroad Company, and William H. Green is an officer of said company.

7. That said A. S. Buford, President as aforesaid, and William H. Green, officer as aforesaid, acting by and through (the order) of said Richmond & Danville Railroad Company as aforesaid, did on the 1st day of June, 1875, cause the gauge of the said North Carolina Railroad, situated, lying and being in the county of Wake, and being of the length of thirty miles in said county, to be widened and changed from four feet, eight inches and the half of one inch, to five feet, and the gauge of the said track has since remained of the width of five feet.

8. That the gauge of the North Carolina Railroad, throughout the whole extent from Charlotte to Goldsboro', on the

Neuse river, has been changed by the Richmond & Danville Railroad Company from four feet, eight inches and the half of one inch, to five feet, a part of the gauge of said railroad, between Charlotte and Greensboro', having been changed by the Richmond & Danville Railroad Company, prior to the act of March the 4th, 1875.

If the Court shall be of opinion upon this statement of facts that the law is with the State, then and in that case we find the defendants guilty, otherwise we find the defendants not guilty."

By agreement of counsel the record of the action entitled *State of North Carolina* v. *The Richmond & Danville Railroad Company*, and the papers in said action and all acts of the General Assembly incorporating railroad companies, and other acts amendatory thereof was to be used in this court as a part of the case, without being attached hereto as exhibits.

His Honor being of the opinion that the facts found by the jury would not warrant a conviction gave judgment accordingly, whereupon the State appealed.

*Attorney General Hargrove,* for the State.

*Merrimon, Fuller & Ashe, Strong, Fowle* and *Badger* for the defendant.

RODMAN, J. It must be assumed in considering this case, that the matters decided in the case of the State against the same company which is now a defendant, 72 N. C. Rep. 634 are the settled law of this State, and admit of no question.

Two things were decided in that case :

1. That the lease of its road, &c., by the North Carolina Railroad Company to the Richmond and Danville Railroad Company was lawful and valid.

2. That the lessees by virtue of the lease, had up to the passage of the Act of 1874–'75 a right to change the gauge of the North Carolina road.

With respect to the lease thus declared to be lawful, it must

be observed that the State of North Carolina owned at its date, and still owns two-thirds of the capital stock of the Company which made the lease, and the Governor by and with the advice and consent of his counsel had power to appoint a proportionate number of the Directors of the Company, who are removable in like manner. (Sec's. 36 and 43 of charter ratified 27th January, 1849.) In short, the State as a stockholder, through its lawfully appointed officers, had the supreme control over every act and contract of the Company, and the lease could not have been made without the express consent of the State. The lease expressly stipulated that the gauge might be changed, and the power to change it, must be considered an inducement to the Richmond and Danville Railroad Company to take the lease.

The lease also contains the following provision: "And the said party of the first part (the North Carolina Railroad Company) for the consideration aforesaid, for itself, its successors and assigns, doth covenant with, and oblige itself unto the said party of the second part, its successors and assigns, that its stockholders and directors will not do any thing, or take any action as such stockholders and directors, that may or can interfere in any way whatsoever with the free use and operation and convenience of said railroad, and other property so hired, let, "farmed out" and delivered, by the said party of the second part, according to the terms and intent of these presents." Notwithstanding this, the State through its Attorney General, shortly after the execution of the lease, commenced a suit against the Richmond and Danville Railroad Company, praying among other things, for an injunction against a change of gauge intended to be made by that Company as lessees. This suit pended for over eighteen months, and soon after it was decided as above set forth, and after the Richmond and Danville Company had begun to change the gauge, as it was held it had a right to do: and as it had a right to have done long before; and after the Company had completed the change over a large part of the road: the General

Assembly enacted the Act of 1874–'75', ch. 159, which (what ever may be its construction upon the language used) intended to prevent any further change, and to prohibit it, as well as a continuance of the change made just before, by penalties and punishments of unusual severity. It is contended for the defendants, that this legislation is a violation by the State of the contract made with the North Carolina Railroad Company in its charter, the rights and powers under which are held by the defendant Company as a lawful assignee for value : and also of the contract made by the State as the governing power in the North Carolina Railroad Company with the defendant Company.

It is also suggested that it appears from the records of the United States Courts within this State, that ever since the making of said lease, the State through its creditors, to whom its stock in the North Carolina Railroad Company was pledged, has claimed and received its share of the rent payable under the lease. As this fact, (if it be one,) does not appear in the special verdict, it cannot be permitted to weigh with us.

Whether the act in question is open to the objection that it impairs the obligation of either of these contracts, is the important question presented to us. In considering it this Court disclaims any power to avoid an act of the Legislature upon an idea of protecting the honor or good faith of the State against any violations real or supposed of either by that body, except so far as that duty is expressly enjoined upon it by the higher law of the Constitution, which its members have sworn to support.

It is seen that the proposition of the defendants is that the act violates :

1. The charter to the North Carolina Company, of whose rights and powers the defendant Company is the lawful assignee ; and

2. The contract of lease made by the North Carolina Company and by the State, as its chief stockholder and governing power, under the laws of the State, to the defendant Company.

These two propositions, though supported mainly by the same arguments, require to be noted, are not identical, for some observations which are applicable to the second proposition are not applicable to the first.

It is too late to question that a charter to a railroad company is a contract between the State and the company, which the State cannot violate. When a corporation has franchises and powers which it may lawfully assign, (as the North Carolina Railroad Company had,) the assignee takes the place of the assignor, and is equally entitled to the protection of the law. The defendant Company, at the passage of the act, held an admitted right to change the gauge as it thought proper. The act prohibited the use of that right and *apparently* impaired the obligation of the charter. The burden is upon those who defend the act to find some recognized principle of law and reason on which it can be supported.

The counsel for the State have undertaken to find this principle in the general police power of the State, and we agree with them that it is to be found there if anywhere, for a right to regulate internal traffic over railroads and navigable waters is but a part of the police power of the State, and is subject to the same limitations and restrictions as that power is. Admittedly, this power is very extensive, and I am not aware that any jurist has yet undertaken to circumscribe and define its limits by any continuous line. All that the Courts have done or can as yet attempt to do, is to make a dot here and there by the decision of a particular case as being within or without the line and leave it to our successors to connect them by a well defined line when they are able to do so. The nearest approach to an attempt of this sort which I have seen is in chapter 16 of Cooley on Constitutional Limitations, and especially on pages 572 and 577. The learned author cites probably all the cases having any direct bearing on the subject of discussion. From these we conclude that the Legislature has power to impose all such regulations on railroad companies in the use of their roads as may be reasonably proper for the

safety, and perhaps the comfort and convenience of passengers and of all others entitled to use the road, and for the protection from injury of the inhabitants and property of the country through which the roads pass. A railroad company, like all other owners of property, is subject to the maxim, " *Sic utere tuo ut alienum non laedas.*" Within that limit it has the same control over its property that an individual has, to use it as it may suit its ideas of its interest. A railroad company, although created in part for the advantage of the public, is not a public corporation in the sense that a county is. It is created also for private benefit, and in respect to those purposes it is a private corporation and its charter is a contract.

The rights of owners of adjoining coal mines are similar in some respects to those of railroad companies whose roads connect. On this subject see the valuable case of *Smith* v. *Kewrick*, 7 Man. Gr. and Scott. 515, (62 E. C. L. R.)

This police power, however extensive, must have reasonable limits. In some places it is said to extend to everything " necessary for the welfare and prosperity of the State." But that would be to remove all limits. Such loose and ill considered expressions mean nothing definite. The limit of the power is the nature of the purpose to be accomplished, having due regard to conflicting rights. A State cannot violate its contract under a pretended exercise of its police power. The act must be *bona fide* intended to relieve some evil within the reach of that power, and strictly applicable to that end. Among the instances held not to be embraced in it are these. In *Pengrief* v. *Washburn*, 1 Aiken 268, the legislature undertook to say that certain persons might go toll free over a road authorized by its charter to take toll generally. *Miller* v. *New York & Erie Railroad Company*, 21 Bart. 513, where the act required the company to make the preparation for a street to cross its track at its own expense. *Bailey* v. *Philadelphia &c., Railroad Company*, 4 Harr. 389, and *Washington Bridge Co.* v. *The State*, 18 Conn. 53, where statutes infringing the chartered powers of certain bridge companies were held void.

In *State* v. *Jersey City*, 5 Dutch. 170, it was held that the Legislature had no right to regulate the speed of railway carriages except in the streets of cities, the necessity extending no further.

The act of 1874'–75, (chap. 159, p. 185,) does not appear to us to present the features of a police regulation. A gauge of five feet does not hazard the safety or convenience of persons using the road, or living along it. The act does not profess to be made for any of the purposes embraced within the police power. The purpose avowed is to compel an uniform gauge of 4 feet 8½ inches on the North Carolina Railroad and on certain other railroads connecting with it, which at that time had that gauge. It may be a wise and convenient policy to require an uniformity of gauge on all the railroads in the State, and it may be convenient to the roads connecting with the North Carolina road, that its lessees should be prevented from changing its gauge from one uniform with theirs, to a different one. But if the lessees of the North Carolina road had a right to change its gauge according to their ideas of their own interests, (as in view of the decision of this Court at the last term, must be admitted), no newly adopted policy of uniformity, or regard for the interests of other roads, will authorize the State to deprive the lessees of this right, *except by virtue of its power of eminent domain, and upon compensation.* Much less had the State the power to compel the lessees to restore to its former gauge, that portion of the road which, at some expense, it had changed before the act was passed.

This conclusion is strengthened by an anticipation of the consequences of a different one.

If the Legislature can now lawfully establish the gauge of the North Carolina Railroad at 4 feet 8½ inches, it can equally establish it at a greater or less width, and can at any time hereafter compel or forbid a change. On the same principle it may at pleasure require or forbid the company to alter its route once adopted, in any particular, its station houses once located, and its rates of fare and freight. In short it may regulate in every

detail the economic management of the road. Such a power would be practically despotic, and might be indirectly but effectually used to destroy the value of the charter and compel its surrender. The claim is new in principle, and no authority, or at least no direct authority can be found to support it.

We are asked to distinguish this case from the *State* v. *Matthews*, 3 Jones, 451. I may not be able to show the distinction to the satisfaction of others. But I think there is a solid one. For whatever reasons, the State had adopted a policy against the issue of Bank bills under $3, before it chartered the Bank of Fayetteville, this policy was apparent to all on its legislation. Prior to that charter, no Bank, then existing, was allowed to issue bills under that denomination. The omission of such a prohibition in the charter of that Bank was apparently an accident. The case was evidently covered (independently of any contract excluding it) by the general police power of the State, and no injury was done to the Bank in relieving the people from the ill consequences of the accident.

The above remarks it will be seen, apply particularly to the act of 1874–'75, in respect to its bearing on the rights created by the charter to the N. C. R. R. Co., and our conclusion on that will dispose of this case. It will not be inappropriate however briefly to consider the act in reference to the provisions of the lease made by that Company, in which the State as a stockholder had the controlling power, assuming for that purpose that in the absence of such lease, the act would be a legitimate exercise of the police power. A State may undoubtedly contract away some portion of its sovereign rights, as this State was held to have done, its right to tax, in the charters of the Raleigh & Gaston Railroad Company, and of the Wilmington & Weldon Railroad Company. Whether a State can abridge its police power, or any other of its sovereign rights, by a contract made by it, not in the exercise of its legislative power, but through its authorized officers as the controlling or only stockholder in an incorporated trading company, is a question which I have never seen discussed.

We do not propose to express any opinion on this question. But it certainly seems contrary to the ordinary principles of justice, that a State, through its authorized officers, should in one capacity make a contract conferring certain rights, (to change the gauge,) and therein expressly contract to do nothing to hinder the use of that right; and immediately afterwards, in its sovereign capacity as legislator, enact a law to make any use of that right highly penal. The State appears in the attitude of receiving with one hand rent from its tenant, and with the other expelling him from the possession.

If the contract had been procured from the officers of the State by fraud or corruption, it could undoubtedly be avoided on that ground. But so far as appears, there is no allegation of that sort. No legal proceedings to avoid the lease have been had on any such ground.

It is unnecessary also to consider the criticisms of the counsel for the defendants upon the language of the act which is admitted by the counsel for the State to be very loose and uncertain.

PER CURIAM.                    Judgment below affirmed.

BYNUM, J. (*Dissenting.*) Deep solicitude for the public welfare and a conviction of impending mischief to the whole State, from the threatened alteration of the North Carolina road, by the alien corporation into whose hands it had fallen must have caused the passage of the Act to prevent that change with a unanimity almost unexampled in legislation. It was the act of the whole people, in the exercise of their corporate sovereignty. Nothing short of the clearest convictions can justify the Court in thwarting the public will so expressed, by declaring their act to be void and of no effect. In doing so, this Court I think, reverses its own decisions, destroys their value as safeguards for the conduct of the citizen, and introduces confusion where order, certainty and consistency should be found.

If the *State* v. *Matthews*, 3 Jones, 451, is good law, (and it is not questioned) ingenuity has failed to distinguish it in principle from this case. It would be better to overrule that case, expressly, than vainly endeavor to distinguish it. That decision cannot stand with this. There, the charter of the Bank of Fayetteville, authorized it to issue and discount bills without any provision in the charter, as to their denomination. Afterwards the Legislature passed a general act making it indictable for any person or corporation to receive or pass any bill of a bank, of a less denomination than three dollars. Mathews, an officer of the bank, was indicted under this statute for passing a bill of the bank of a denomination less than $3 ; and he relied upon the defence, that he was protected by the charter of the bank, as a contract with the State which was protected by the Constitution of the United States, forbidding the passage of any law impairing the obligation of contracts. The defendant was convicted, and in affirming the judgment this Court said : " Is the authority to issue small notes conferred by the charter, a part of the essence of the contract, with the intention to put it beyond all future control of legislation? or is it conferred as a mere incident, with the intention that it should be subject to such limitation as it might at any time thereafter be deemed expedient to make for the regulation of the currency of the State? This is a mere question of construction, and a plain statement seems sufficient to dispose of it. With the exception of the powers surrendered to the United States, each State is absolutely sovereign. With the exception of the restraints imposed by the Constitution of the State and the bill of rights, all legislative power is vested in the General Assembly. It is consequently, unreasonable to suppose that the General Assembly, admitting it has the power, would alien or surrender, and make subject to any individual or corporation a portion of its sovereignty, and thereby disqualify itself from doing that for which these ample powers are conferred on it. As is said in *McRae* v. *The W. & R. R. Co.*, 2 Ired. 189, " we should hesitate long before

bringing our minds to the conclusion, that it was the intention of the Legislature to take from itself, the power of doing that for which all governments are organized, promoting the general welfare, by adopting such measures as a new state of things might make necessary for the benefit of the public; in other words, it is unreasonable to suppose an intention to surrender the means by which it may thereafter be able to effect the purpose for which it was erected and formed into a government." It follows, that to establish a contract on the part of the Legislature, to relinquish any of its powers, plain and unambiguous words must be used."

The reasoning of the Court is unanswerable. If the reserved powers of the sovereign can be successfully interposed for the public good in the case of a small bank of limited circulation, how much more can it be when the commerce and general welfare of the whole State is involved ? The bank charter was as much a contract with the State as a railroad charter; yea, more so, because a bank charter is strictly a private act, whereas a railroad charter is *quasi* a public act. The bank was authorized to issue bills of any denomination ; so the railroad company was authorized to lay a track of any gauge. The bank officer, after the prohibitory act, passed the forbidden bills and was indicted and punished. The officers of the railroad, after being prohibited, changed the gauge, and by the law go unpunished. The bank perpetrated a small and temporary mischief; the railroad a mischief co-extensive with the State and of indefinite duration. Every reason of policy and public good which applied to the bank applies with tenfold force in this case.

But *Matthews'* case is fully sustained by *Privett* v. *Whitaker*, decided at the present term of this Court. There, the plaintiff being the owner of a lot in the town of Goldsboro, began the erection of a wooden building thereon and had made some progress in the work. Afterwards the corporation passed an ordinance forbidding the construction of wooden buildings within a district of the town, which embraced this

lot. The town authorities, in pursuance of this ordinance, entered upon the lot and by force stopped the workmen engaged on the building from further proceeding with the work. This Court sustained the ordinance and justified the act of the town authorities. Here the owner of the lot held it by a contract certainly of as high obligation as that of the railroad company, to wit, by the grant of the State. Yet in the face of this grant the Court held, that under the power vested in the corporation by the Legislature, the town could prevent him from beginning or completing such a building upon his own land. What higher or more arbitrary exercise of sovereignty can be found than this, apparently in the face of the express grant and contract of the State? In delivering the opinion of the Court, RODMAN, J., places the right upon the power of the State to abate nuisance. But it must be observed that the town ordinance did not declare such a structure to be a nuisance, but simply forbade the erection, without designing any reason or naming any grievance to be apprehended therefrom. It is immaterial by what name you call a prohibited act, or whether it has any name, nuisance or other, or by what name you call the power of preventing or abating it—whether the right of eminent domain or the police power—it is, nevertheless, an unquestionable sovereign power, residing in the State, to do, or forbid the doing, those things which the exigencies and welfare of society demand. Whether the emergency requires the intervention of this power must, from the nature of things and the organization of our form of government, rest in the sound discretion of the legislative body. In *Privett's* case, the corporation forbid the completion of a house begun; in this case the State forbid the widening of the gauge. Can the individual be restrained by penalties and even force, and the corporation go free? Both parties made their contract and hold their property, subject to the paramount right of the sovereign so to regulate its use and enjoyments as will be most conducive to the comfort, good order and general welfare of the body politic. Rights of property, just as our

social rights, are subject to such limitations in their enjoyment as the governing power may think necessary or expedient. Of the perfect right of the Legislature to exercise this power, no question can be made. Nor can it be at all affected by that clause in the Constitution of the United States which forbids the passage of laws impairing the obligation of contracts. All contracts and all rights are subject to this power.

It is well settled, that regulations of this character, though they may disturb the enjoyment of individual or corporate rights, are not unconstitutional, though no compensation is made for the disturbance. They do not appropriate private property for public use—there is no pretence of such appropriation in our case—but only regulate its use and enjoyment by the owner. If he suffer injury, it is either *damnum absque injuria*, or in the theory of the law, he is compensated for it, by sharing in the general benefits which the regulations are intended and calculated to secure. Every one owns his property subject to this restriction, to-wit, that it must be so used as not to injure others, and that the sovereign may, by police regulations, so restrain and direct the use, that it shall not prove pernicious to his neighbors or the citizens generally.  1 Dillon on Cor Sec. 93, and cases cited.

It is true, that the Legislature cannot make an unreasonable use of this power, and under the guise of exercising a police power, infringe individual or corporate rights, and it is equally true that the Courts, under the pretext that the Legislature has so acted, cannot nullify a statute.  Good faith is to be imputed to the Legislature, and all its acts must be presumed to be founded upon a just consideration of the rights and the wellfare, both of the public and individuals.  It can have no will and no interest opposed to the public good.

What is the history of this prosecution? Soon after the lease was made to the defendant road, the State of North Carolina instituted proceedings against the defendant road, alleging in the complaint that the lessee had resolved to change the gauge of that portion of the road lying between Greensboro'

and Charlotte, and asking for an injunction to prevent that change   The defendant answered, confessing the purpose to make the alleged change, claiming the right to do so under the lease, and that it was necessary and convenient to make that change, *so as to make the track correspond with the connecting lines of road north of Greensboro' and south of Charlotte.* So it is manifest that at that time the defendant road did not, and could not, in pursuance of its declared purpose of conforming the gauge to other gauges, contemplate a change of gauge east of Greensboro', which would produce a disconformity with that of all the railroads of the State east of Greensboro'. It is then clear, both from the reason of the thing and the intention of the defendant, as declared in the answer, that the change of gauge east of Greensboro', is an after thought and a device. This view is confirmed by the fact, that the change of gauge for which the defendants stand indicted, was not begun until near four months after the change between Greensboro' and Charlotte, and four months subsequent to the passage of the statute forbidding it. Not the slightest weight, then, can be attached to the suggestion that the statute was captious, and if observed would have stopped the work of change of gauge in the midst, causing great damage to the road, without providing compensation. This defence is utterly refuted by the special verdict, which finds as a fact, that the change between Greensboro' and Charlotte was completed before the passage of the act; and I feel warranted by the facts, in saying that when the statute was passed, the railroad company did not contemplate any other or further change, than what had then been made. Nor in determining the validity of the act, can the slightest weight be given to the severity of the penalty inflicted for a violation of the law. With that, this tribunal has no concern. Nor yet can this Court pay any regard to suggestions, that the directors of the North Carolina Railroad, representing the stock and interests of the State, concurred in the lease, with the powers therein contained, to change the gauge. If the fact were so, the di-

rectors could only represent the State, as a private stockholder, and their assent to the lease could have no possible effect in determining the constitutionality of the statute, or the police powers of the State as a sovereign. Nor, again, can the decision of the Court at the last time, *State* v. *R. & D. R. R. Co.*, 72 N. C. Rep., 634, be invoked in behalf the defendants. The only question raised and decided there was, that as the law stood at the time that action was instituted, the defendant company, by virtue of the charter, had the right to change the gauge. We have assumed the validity of that decision, throughout this discussion. The very question raised by the special verdict and argued here is, whether the subsequent legislation in a constitutional sense, was a violation of the contract between the State and the Company, or was a legitimate exercise of the police power of the State. The criticism upon the preamble to the statute forbidding the change of gauge, that it is for the benefit of certain other roads, at the expense of the defendants' road, cannot assist the argument.

The recital in the preamble, sets forth the most urgent reason for the act, to wit, that there may no longer be any doubt as to the policy of the State as to the gauge of the roads, and that the proposed change would seriously affect all the railroads of the State, and thus through them the commercial and other interests of the people. No array of public inconveniences, could more loudly call for quick and decisive action by the legislative body, entrusted with the public welfare.

The question before the Court does not call upon us to ascertain and accurately define the limits of the police power of the State, or how far the police power or the right of eminent domain, may extend in derogation of essential or non-essential parts of a contract. It is perfectly well settled, however, that the right of the States to exercise both powers, does not impair the obligation of contracts within the meaning of the prohibition of the Constitution of the United States. It is also well settled that all property is held and all contracts are made, subject to this power. The State is the exclusive judge

both of the necessity and the extent of the exercise of either power. 2 Dillon, sec. 455, 6 How., 507, 13 How., 71. And in the exercise of the general police power of the State, or of taxation, private property may be taken for the public use without compensation therefor. Sedg. on Stat. and Const., laws 1853–'54–'55. Suppose the Legislature, to prevent injury to live stock, should, by statute, direct the North Carolina Railroad Company to enclose the road by a fence and to keep it in repair. It is well settled that such a statute can be enforced, however costly to the corporation as a police regulation. So the State can, in like manner, forbid such corporations to erect wooden depots and shops in towns along the line, or even cause the removal of such, already constructed upon their own property. 42 Bt. 339, 66 Penn., 164, 26 Wis., 145. These are but illustrations of the proposition that all contracts are made, subject to the paramount authority of the State, to control their enjoyment, so as to subserve the general welfare, the purpose for which society is organized.

I think judgment should have been given against the de fendants upon the special verdict.