WILLIAM PARKER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa September 27, 1884.*

1.  FISHERY—FISHWAYS—*constitutionality of the act of 1879, providing for the free passage of fish in the waters in this State—prescriptive rights as against the public.* The act of 31st of May, 1879, provides "that it shall be the duty of any person or persons who now owns, or may hereafter erect, any dam or other obstruction across any of the rivers, creeks, streams, ponds, lakes, sloughs, bayous, or other water-courses within this State, to place therein suitable fishways, in order that the free passage of fish up or down or through such waters may not be obstructed." On a prosecution against the owner of a mill dam which was erected across a river, and which it was alleged obstructed the free passage of fish up and down the river, to recover the fine prescribed in the act for a neglect or refusal to comply with its requirements, it was held to be within the constitutional power of the legislature to impose the duty as provided in the statute.

2.  Nor could the owner of the dam, by occupancy or user for any length of time, acquire a prescriptive right as against the public, so as to prevent the enforcement of the provisions of the statute against him.

3.  SAME—*claim of right as under a contract with the State—effect of the act as impairing the obligation of such contract.* The owner of a mill dam which had been in use for many years, procured to be passed an act of the legislature authorizing him to raise this dam higher, or to erect a new one at that place. The dam, both prior and subsequent to that act, was of such character as to entirely obstruct the passage of fish in the stream on which it was situated. It was contended by the owner that the act giving him the right to raise the dam, or to erect another, possessed the elements of a contract that he might continue in its use, so that a subsequent statute imposing the burden of erecting a fishway in the dam would impair the obligation of such contract, and therefore would be unconstitutional. The act conferring authority to raise the dam, or to erect a new one, contained no words indicating a purpose on the part of the legislature to surrender the power of the State to control the use of its water ways in respect to the free passage of fish, so that, without reference to the question whether it was competent for the legislature to make such surrender of its powers, the act was construed as not having that effect.

WRIT OF ERROR to the Circuit Court of Kendall county; the Hon. C. W. UPTON, Judge, presiding.

Mr. A. J. HOPKINS, and Mr. N. J. ALDRICH, for the plaintiff in error:

Common right of fishery, free fishery, and a several fishery, are defined and distinguished in 3 Kent's Com. 329; 1 Bouvier's Law Dic. 592; *People* v. *Platt,* 17 Johns. 204.

All streams below tide water are *prima facie* public, and all above are *prima facie* private. *King* v. *Montague,* 4 B. & C. 598; *Wardworth* v. *Smith,* 11 Maine, 278; Angell on Watercourses, p. 596, sec. 535.

This court will take judicial notice that Fox river is above tide water, and not navigable in fact. . *Cummings* v. *Stone,* 13 Mich. 70; *Tewksberry* v. *Schulenberg,* 1 Wis. 584; *Harding* v. *Strong,* 42 Ill. 148.

As to what is a navigable stream, see *Munson* v. *Hungerford,* 6 Barb. 370; *Curtis* v. *Keesler,* 14 id. 511; *Rhodes* v. *Otis,* 33 Ala. 534.

In fresh water streams the right of the public is merely the right to use the water within the channel for purposes of navigation. *Walker* v. *Board of Public Works,* 16 Ohio, 544.

The riparian owner has the exclusive right to take fish from any part of a stream, great or small, over his soil. Angell on Water-courses, (7th ed.) 68, 70, 65; *Adams* v. *Pease,* 2 Conn. 481; *Jackson* v. *Keeling,* 1 Jones' L. (N. C.) 299.

The uninterrupted use, possession and control of the dam for nearly fifty years gives a vested right by prescription, which can not be divested without compensation. (*Bealey* v. *Shaw,* 6 East, 208; *Woolever* v. *Stewart,* 36 Ohio St. 146.) But plaintiff in error is not limited to the rights acquired from long usage. The charter from the State of Illinois, set forth in our statement of facts, is a contract between him and the State, which can not be invalidated or impaired by any legislative enactment subsequent to the grant of such charter. One of the leading cases in this country on that subject is the case of *Fletcher* v. *Peck,* 6 Cranch, 132.

The statute relating to fishways is a subsequent act of the legislature, which alters and impairs that charter or franchise, and, as held in the *Dartmouth College case*, 4 Wheat. 518, such subsequent legislation impairing the obligation of the charter is unconstitutional and void. When no power is reserved by the legislature to alter the charter, it can not be done, nor can additional burdens be thrown upon it without the consent of the corporator. *Commonwealth* v. *Monongahela Navigation Co.* 6 Barr, 379; Harrington's Rep. 389; *Farrington* v. *Tennessee*, 95 U. S. 681; *People* v. *Platt*, 17 Johns. 195; *State* v. *Glenn*, 7 Jones' L. 322; *Crenshaw* v. *Slate River Co.* 6 Rand. 255; *Commonwealth* v. *Pennsylvania Coal Co.* 66 Pa. St. 47; *Lake View* v. *Rose Hill Cemetery Co.* 70 Ill. 195; Cooley's Const. Lim. 719.

Mr. EUGENE CANFIELD, and Mr. R. P. GOODWIN, for the People:

No one can prescribe for a public nuisance. Washburn on Easements, 481.

The appropriation to one's self of public property which should be common to all, is a purpresture, and a public nuisance. Wood on Nuisances, sec. 14; *Dunning* v. *City of Aurora*, 40 Ill. 481.

The fouling of a stream with waste from a mill, like sawdust and the like, is of the same character. *Veazie* v. *Divinel*, 50 Maine, 495; *Davis* v. *Winslow*, 51 id. 93; *Gerrish* v. *Brown*, id. 256.

Where a slaughter house was built in a place remote from buildings, and the business then carried on for twenty years, it was held this did not authorize the owner to continue it after houses had been built and roads opened in the neighborhood. *Commonwealth* v. *Upton*, 6 Gray, 476; *People* v. *Cunningham*, 1 Denio, 536.

The private act of 1857 is not a charter, and all then granted could have been granted by a general law. *Thomas*

v. *Railroad Co.* 101 U. S. 71 ; *Fertilizing Co.* v. *Hyde Park,* 97 id. 666 ; *Delaware Railroad Tax,* 18 Wall. 206 ; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420 ; *Providence Bank* v. *Billings,* 4 id. 548; *United States* v. *Arredondo,* 6 id. 738; *Ohio Life Ins. and Trust Co.* v. *Debolt,* 16 How. 416 ; *Railroad Co.* v. *Briggs,* 2 Zabr. 620; Sedgwick on Stat. and Const. Law, 595.

Public grants are to be construed strictly. Nothing passes under them by implication, and all doubts are solved in favor of the State. *Harbor Co.* v. *Monroe City,* Walker's Ch. 155.

The private act in question is itself unconstitutional and void. Its whole scope is to grant to Michael C. Parker, his heirs and assigns, the power of taking or injuriously affecting private property for a private use upon making compensation, without the consent of the owners. This it was beyond the power of the legislature to grant to him. *Ryerson* v. *Brown,* 35 Mich. 333 ; *Loughbridge* v. *Harris,* 42 Ga. 500 ; *Hay* v. *Cohoes Co.* 3 Barb. 47 ; *Sadler* v. *Langham,* 34 Ala. 311 ; *Tyler* v. *Beecher,* 44 Vt. 648 ; *Coster* v. *Tide Water Co.* 3 C. E. Green, (N. J.) 54.

Every owner of a dam holds it on the condition that a sufficient and reasonable passage may be allowed for fish. *Holyoke* v. *Lyman,* 15 Wall. 500 ; *Stoughton* v. *Baker,* 4 Mass. 528 ; *Burnham* v. *Webster,* 5 id. 266 ; *Nickerson* v. *Brackett,* 10 id. 212 ; *Commonwealth* v. *McCurdy,* 5 id. 324; *Cottrill* v. *Merrick,* 12 Maine, 229 ; *Vinton* v. *Welsh,* 9 Pick. 92 ; *Commonwealth* v. *Essex Co.* 13 Gray, 244 ; *Commonwealth* v. *Chapin,* 5 Pick. 204.

The police powers of the State are inalienable, and its legislature can not bind itself by contract not to exercise them. *Stone* v. *Mississippi,* 101 U. S. 814 ; *Beer Co.* v. *Massachusetts,* 97 id. 25 ; *Boyd* v. *Alabama,* 94 id. 645 ; *Commonwealth* v. *Internal Liq.* 115 Mass. 153 ; *Metropolitan Board of Excise* v. *Barrie,* 34 N. Y. 657.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This case involves the question whether an act of the General Assembly is, or not, unconstitutional. We are fully impressed with the gravity of the question involved, and the important, if not vast, results that must flow from its determination. There are few questions that more vitally concern the future interests and welfare of the people than does this question. Again, it is always a delicate matter to review the action of the other coördinate branches of government, who act under the same obligations to observe and support the constitution that are imposed upon us. We have therefore, in view of these considerations, bestowed an unusual amount of labor, thought and pains in the investigation of the question, and shall proceed to state our conclusions.

The act under which this proceeding was instituted was adopted on the 31st of May, 1879, (Sess. Laws, page 171,) which is declared to be an amendment to a prior act. It provides: "That it shall be the duty of any person or persons who now owns, or may hereafter erect, any dam or other obstruction across any of the rivers, creeks, streams, ponds, lakes, sloughs, bayous, or other water-courses within this State, to place therein suitable fishways, in order that the free passage of fish up or down or through such waters may not be obstructed." And it imposes a fine not exceeding $200 a year for not complying with the requirements of the statute, to be recovered before any justice of the peace of the county where such dam or obstruction may be situated. Defendant being the owner of a dam across Fox river, and refusing to comply with the law, was prosecuted before a justice of the peace, and on a trial a judgment was rendered against him. He appealed to the circuit court of the county, where a trial was had with the same result, and he brings the case to this court on error, and urges a reversal.

All the facts are conceded by stipulation of the parties. It is agreed that the dam was erected across Fox river, where it now stands, in the year 1836, and was raised to its present height in July, 1853, and has been so maintained ever since; that in 1842 Michael C. Parker, a remote grantor of plaintiff in error, purchased the land on which the mills and dam are situated, from the general government; that M. C. Parker, in 1857, procured the passage of an act of the General Assembly authorizing him, his heirs or assigns, to raise this dam higher, or to erect a new one at that place; that the dam always has obstructed, and now obstructs, the passage of fish in the river, and to construct a fishway in conformity to the act would cost about $600; that plaintiff in error has owned and used the mills and dam since in 1871, and maintained the dam at its present height since that time; that he has succeeded to and is possessed of all the rights with which Michael C. Parker was invested. These are the material facts of the case.

Plaintiff in error insists that he has a prescriptive right to maintain his dam as now constructed, as it has been used in its present condition, by himself and grantors, for more than twenty years; that the law requiring him to construct a fishway connected with his dam would be to deprive him of his rights without due process of law,—if intended for public use, without due compensation, or if for private use, then not only without compensation but without the semblance of constitutional warrant. He also contends that the act of 1857 was a charter, and as such is or contains a contract, and this law violates its obligation, and is repugnant to the contract clause of the Federal and State constitutions, and is therefore void. When the dam was erected it was without right, and by a trespass on the lands of the government, and before Michael C. Parker purchased the land of the general government, the legislature had by enactment, in 1840, (Sess. Laws, 93,) declared Fox river a navigable stream and public high-

way.    It then follows that he purchased subject to the power
of the legislature to control the use of the stream to the same
extent it had to regulate the use of other streams in the State
which were navigable in fact.    After the passage of that act
Parker maintained his dam as an obstruction to a navigable
river, and in violation of that law, because by the passage of
that act it became public in its use, and its use was under
the control of the legislature.    He, in all probability, to obtain
a license to maintain his dam, procured the passage of the
act of 1857, authorizing him to raise the height of the dam
or to erect a new one; but did that act withdraw or surrender
permanently the power of the General Assembly to protect
the passage of fish in the stream?    There is no rule of con-
struction more familiar or more firmly established, than that
all grants of powers must be taken most strongly in favor of
the State and against the grantee.    In such cases nothing
passes that is not in the letter or by clear and unmistakable
implication, and when the State makes a grant, the thing or
right is subject to legislative control, precisely as other rights
not derived from government; and inasmuch as this was a
license to maintain a dam in a navigable river, we have no
right to hold that the legislature intended to repeal the act
of 1840, so far as it related to the river above this dam.
Such would be the effect if it should be held that Parker,
his heirs or assigns, may maintain a complete obstruction at
that place.    It is not a reasonable inference that the General
Assembly contemplated such a result.    The act contains no
language that in terms, or by implication, declares such a
purpose.    We must therefore hold that the license was made
subject to legislative control.    There is nothing in the act
that warrants the conclusion that the General Assembly de-
signed to permanently surrender any portion of its power of
control over this river for the protection of fish.    That the
legislative branch of government has the power to prevent
the erection and maintenance of obstructions in navigable

streams can not be successfully controverted, and all must know that any obstruction to the passage of fish necessarily must obstruct the passage of boats and other water craft. We, therefore, have no hesitation in saying that the legislature, if it had the power, never intended by that act to permanently abandon the control for the free passage of fish in this river. Had it intended to repeal or amend the act of 1840, it is but reasonable to suppose it would have been done in terms.

There are some things, and they are the most essential of all to man, that are incapable of individual ownership. Such are air and water. All may and do participate, without restraint, in their enjoyment. They are the common inheritance of mankind. There are other things to a large extent incapable of individual ownership, and of these are game and fish, and they belong to the entire community, collectively; and belonging to all equally, for their protection from extinction, and to preserve the common ownership in all, they are, and of necessity have ever been, subject to legislative control. If they were not, the few would, by their destruction or appropriation, deprive the balance of the community of their rights in this common inheritance. Belonging to all, common justice requires their preservation for the use and enjoyment of all. From the wild and wandering nature of fish they are not, nor can they be, the subject of ownership in running streams, like animals and fowls which have been domesticated. The nature of fish impels them periodically to pass up and down streams for breeding purposes, and in such streams no one, not even the owner of the soil over which the stream runs, owns the fish therein, or has the legal right to obstruct their passage up or down, for to do so would be to appropriate what belongs to all to his own individual use, which would be contrary to common right, and all having a common and equal ownership, nothing short of legislative power can regulate and control the enjoyment of this common

ownership. This must be so from absolute necessity. There is not, nor can there be, any other means of protecting each individual in the enjoyment of the rights his joint ownership confers, hence the necessity of legislative action to preserve and protect the rights of each and all in their common inheritance. Therefore the power of the legislature to act must be admitted.

The common law has always recognized the right of the riparian owner to take fish in the waters running over his own soil, and appropriate them to his own use; but the fish being the common property of the people, such owner has never had the right to obstruct their passage from that portion of the river which flows over his land, nor has he the right to wantonly destroy the fish passing over it, and thus deprive the community of their right to and ownership in the fish,— hence the manner in which, the time when, and the amount such riparian owner shall take, for the preservation of the common property, is a legislative and governmental function. Government was organized to protect the general and collecttive rights of the governed as fully as the individual rights of each member of the body politic,—and this power, as we shall see, has been exercised as a legislative function by the British parliament almost from the time of its organization, as well as by our State governments since their organization.

At an early period, before and immediately after our State government was organized, the legislature adopted what is now chapter 28 of the Revised Statutes of 1874, and that provision has ever since remained in force in this State. It provides: "The common law of England, so far as the same is applicable and of a general nature, and all acts of the British parliament made in aid of and to supply the defects of the common law, prior to the fourth year of James I," (excepting several statutes specified,) "and which are of a general nature, and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until

repealed by legislative authority." We shall refer to Magna Charta and some of the early British statutes on this subject in aid of the common law, to show that under that law the regulation of the right to take fish, and for their increase and preservation, was always considered a legislative function. Under the common law, obstructions to the passage of fish were held to be public nuisances, and subject to legislative control.

That these rights were always, from the earliest times, considered of great public interest and of vast importance, is manifest from Magna Charta and the early British statutes. The arbitrary kings after the conquest claimed the game and fish in the kingdom as a part of their prerogative, and conferred on their favorites and dependents royal franchises to take game and fish, to the exclusion of the people. This being in derogation of common right, there were many struggles to compel their monarchs to restore their ancient rights. The first that proved successful was in 1215, when King John was compelled to restore them by Magna Charta. The restoration of the rights it confirmed had been petitioned for during several previous reigns, but although promised, were never restored. Succeeding monarchs disregarded its provisions, but they were compelled to reaffirm the great charter. The 39th chapter of that instrument declares: "All kydells (weirs) for the future shall be quite removed out of the Thames and the Medway, and through all England, except on the sea coast." (Thom. Es. Mag. Ch. 81.) This charter or declaration of rights was confirmed by Henry III, in 1216, (id. 112,) and again by the same monarch in 1217, (id. 125,) and a third time in 1224–25. (Id. 138.) It was also confirmed by Edward I, in 1297,—and in each of these confirmations the provision in regard to weirs is in precisely the same language. As illustrating the great importance attached to the right of fishery, the 48th chapter of the same charter provided: "All evil customs of forests and warrens, and foresters and war-

reners, * * * water banks and their keepers, shall imme-
diately be inquired into by twelve knights of the same county,
by oath, * * * and within forty days after inquisition is
made they shall be altogether destroyed by them, never to be
restored." (Id. 85.) This author, in his notes, (page 203,)
says, speaking of this last provision of the charter: "It
ordains that river banks shall not be defended excepting at
their ancient places and boundaries; and its intent was, says
Lord COKE, that no owner of such banks should in the future
so appropriate or keep the rivers separate to himself as to
prevent others from fishing or having passage at them." Sir
Edward COKE says that Magna Charta and the Charta For-
esta have "been confirmed, established and commanded to be
put into execution by thirty-two several acts of parliament
in all;" and inasmuch as. this provision in regard to weirs
seems to have been embraced in all of them, it establishes
beyond all question that the power to control the exercise of
the right of fishery was then, as it has been ever since, re-
garded as of national concern, and of such public importance
as to form one of the chapters of the constitution or bill of
rights of the British people, maintained only by long and
bitter struggles.

The first statute we shall refer to is the 2d Westminster,
13th Edw. I. It provides: "The waters of Humber, Owse,
Trent, Dove, Arre, Derewent, Wherfe, (Nid, Yore,) Swale,
Tese, (Tine, Eden,) and all other waters, (wherein salmons
be taken,) shall be in defence for taking salmons, from the
Nativity of our Lady unto St. Martin's day; and likewise,
that young salmons shall not be taken nor destroyed by nets,
nor by other engines, at mill pools, from the midst of April
unto the Nativity of St. John the Baptist; and in places
(where as fresh waters be) there shall be assigned conserva-
tors of this statute, which, being sworn, shall oftentimes see
and inquire of the offenders; and for the first trespass they
shall be punished by burning of their nets and engines, and

if they offend a second time they shall be punished by imprisonment for a quarter of a year, and if they offend a third time they shall be punished by imprisonment for a whole year, and as their trespass increaseth so shall their punishment." (1 Eng. Stat. at Large, 211.) The 13th Richard, 2 C. 19, contains similar provisions. The 1st Eliz. 17, prevents the taking of young fry or spawn of fish, and it also prohibits the taking of various kinds enumerated, under specified lengths. The 3d Jac. 1 C. 12, prohibits the erection of weirs at specified places, or using nets to destroy the fry or spawn of sea fish. And there are a number of ancient statutes that are local to counties or particular streams. There are other statutes of the same character adopted by parliament, on the same subject, that might be referred to. It thus appears that the preservation and the regulation of the mode and time of taking fish was of public concern, and a proper subject of legislation. It is thus distinguished from a mere private right not within the domain of legislation.

But as bearing on this question, as on the question of prescription, we will refer to some cases that shed much light on it. In *Weld* v. *Hornby*, 7 East, 195, Lord Ellenborough said: "The erection of weirs across rivers was reprobated in the earliest periods of our law. They were considered as public nuisances. The words of Magna Charta are, that 'all weirs from henceforth shall be utterly pulled down by *Thames and Medway, and through all England,*' etc. And this was followed up by subsequent acts treating them as public nuisances, forbidding the erection of new ones, and the enhancing, straitening or enlarging of those which had aforetime existed. I remember that the stells erected in the river Eden by the late Lord Lonsdale and the corporation of Carlisle, whereby all the fish were stopped in their passage up the river, were pronounced, in this court, upon a motion for a new trial, to be illegal, and a public nuisance. Now, here it appears that previous to the erection of this complete stone

weir there had always been an escape for the fish through
and over the old brush-wood weir, in which those in the
stream above had a right, and it was not competent for de-
fendant to debar them of it by making an impervious wall of
stone, through which the fish could not insinuate themselves
as it is well known they will through a brush-wood weir, and
over which it is in evidence that the fish could not pass,
except in extraordinary times of flood; and however twenty
years' acquiescence may bind parties whose private rights
only are affected, yet the public have an interest in the
suppression of public nuisances, though of longer standing."
In the same case, LAWRENCE, J., said: "There is no bar to
the action from any length of possession in the defendant."
That case was by an upper riparian proprietor, and it ap-
peared by ancient deeds that for two centuries before that
time the owners of the mill and weir had the right to maintain
them, as expressed in the deeds; nor did they limit it as to
its height, nor the materials of which it should be constructed.
It is true, in that case the cause of action accrued within
twenty years, but Lord ELLENBOROUGH referred to a case de-
cided in the King's Bench, where it was held that such
obstructions were illegal, and a public nuisance, and he so
announced the doctrine in the case he was then deciding.
We are aware that in comparatively recent cases in the courts
of that kingdom the doctrine of *Weld* v. *Hornby* has been dis-
regarded, but we prefer the exposition of the common law in
that case to the more recent decisions of their courts, and are
inclined to follow it as the better doctrine.

In the case of *Eubank* v. *Pence*, 5 Litt. (Ky.) 338, which
was a condemnation proceeding for the erection of a mill and
dam, the court said: "The inquest of the jury, taken under
the writ of *ad quod damnum* which issued in this case, not
having ascertained whether or not fish of passage will in any
degree be obstructed, the court erred in ordering the mill seat
to be condemned, and in giving permission to Pence to erect

38—111 ILL.

a mill. The order, therefore, must be reversed, with costs, the cause remanded to the court below, and the inquest of the jury quashed," etc. The legislature of Kentucky at an early period adopted the common law of England, and all statutes of the British parliament in aid thereof, and of a general nature and applicable to the condition of the people, passed prior to the American revolution, with exceptions similar to our statute. But concede this was under a statute of the State, still it shows the preservation of fish was regarded as of such public concern as to fall within the domain of legislative power. If not under such an enactment, it must have been under ancient British statutes.

In the case of *Stoughton* v. *Baker*, 4 Mass. 522, (two years subsequent to the decision of *Weld* v. *Hornby*, *supra*,) Chief Justice PARSONS, in delivering the opinion of the court, said: "But the right to build a dam for the use of a mill was under several implied limitations. One was, to protect private rights by compelling him to make compensation to the owners of land above, for, and damages occasioned by, overflowing their lands. Another was, to protect the rights of the public to the fishery, so that the dam must be so constructed that the fish should not be interrupted in their passage up the river to cast their spawn. Therefore, every owner of a water mill or dam holds it on the condition, or perhaps under the limitation, that a sufficient and reasonable passageway shall be allowed for the fish. This limitation, being for the benefit of the public, is not extinguished by any inattention or neglect in compelling the owner to comply with it, for no *laches* can be imputed to the government, and against it no time runs so as to bar its rights." Another objection, he says, was urged, that if the resolution was constitutional, the legislature might authorize strangers to enter without right on the freehold or lawful possession of another. To this he answered: "This objection, supposing strangers enter without right, is begging the question; for if the owner of the dam holds it under the

limitation mentioned, that limitation must extend to give a right to the government to enter and remove obstructions, which, if not removed, would defeat the limitation." This case was followed by a number of cases, among others the cases of *Commonwealth* v. *Chapin*, 5 Pick. 199, and *Vinton* v. *Welsh*, 9 id. 87, which recognize the exclusive right of riparian owners to take fish on their own lands, but expressly hold, as against the public they have no right to obstruct their passage, and it is expressly held that the right is under legislative control.

In the case of *Carson* v. *Blazer*, 2 Binn. 475, it was held that the common law never prevailed in the State of Pennsylvania, which recognizes the exclusive right of the riparian owner to take fish in a stream flowing in front of or bounding his land, and such has been the recognized doctrine of that tribunal ever since. It has been followed by subsequent cases in that court.

In the case of *Hooker* v. *Cummings*, 20 Johns. 90, the doctrine of the common law was fully recognized and applied, and it was said: "The legislature have, confessedly, the right of regulating the taking of fish in private rivers, and do every year pass laws for that purpose as to rivers not navigable in any sense, and which are unquestionably private property."

The cases here referred to fully establish the doctrine that whatever the private right of taking fish in streams flowing over a man's land, it is under the limitation that its exercise may be regulated and controlled, as public necessity may require; and they clearly announce the rule that their free passage may be secured by enactment, or it is secured by the common law.

As early as in 1807 the territorial legislature of Indiana adopted an act for the purpose of preserving fish in our waters, this State then being a portion of that territory. The act provided for the condemnation of mill seats by a writ of *ad quod damnum*. It required the jury impaneled, to assess

damages by reason of constructing the mill dam; also, to inquire whether, and to what extent, fish of passage or migration would be obstructed, and by what means such obstruction could be prevented. This law was in force when our territorial government was organized. The provision in relation to fish was dropped out when the laws were revised, after the State government was organized, and only restored by the act to which this is an amendment. In 1817 the territorial legislature passed an act authorizing Ezra Owen to erect a dam in the Kaskaskia river, for the purpose of taking fish. It contained a provision that the dam should not obstruct the passage of fish or ordinary navigation. (Sess. Laws 1817–18, p. 26.) This act was retained in the revision of 1819. (Laws, p. 351.) It is thus seen that in that early period of our history the legislative branch of our government claimed and exercised the power of preserving the fish in our waters. At that time it appears the exercise of the power was regarded as an inherent and unquestioned function of legislation.

But if any doubt existed, it is removed by the 22d section of article 4 of our present constitution. It provides that the General Assembly shall not pass local or special laws in a number of enumerated cases, and among the cases enumerated is "the protection of game and fish." This unmistakably recognizes the power as then existing, and undeniably authorizes its exercise. This must end all dispute as to the power. This limitation of the power of the legislature in all of the cases enumerated refers to matters of a public nature, and among them is the protection of fish, which was regarded so important to the public that the legislature was restricted and prevented from granting, by special or local law, any privileges or exemption from a general law. It was esteemed too important a public interest to permit any person, even with the consent of the legislature, to escape from conforming to any general law which should be passed on the subject.

All must admit that from the remotest times game has been the subject of protection by legislation in Great Britain, and in this country since its settlement; nor has any one, until recently, questioned the constitutional power to adopt such laws, and our constitution places both the preservation of game and fish on the same basis and equality. There is no question that more concerns the public than an abundant supply of cheap and healthy food. In a densely populated country it is the all absorbing question that engages the attention of its people and the government. It is the basis of the happiness, prosperity and contentment of all peoples. And with our unparalleled increase of population, vast as is our domain, in a generation more it will become the all absorbing economical question for the government to solve. Even now, in some portions of the Union, it is taxing the energy of the people and the wisdom of statesmen, to a high degree, to provide against pinching want; and it must be obvious to all that the question of the increase of the supply of food, and the preservation of the sources of its supply, are matters of the highest public concern. There are few, if any, questions that should attract the attention of the lawmakers to a greater extent, because of its public importance. All will concede the vast importance of the commercial and manufacturing interests of the country, and in recognition of their importance these interests have received aid and protection from the government; but no one can say they are of paramount importance more than an abundant supply of cheap food for the people, nor should the sources of such a supply be sacrificed to either or both of the other great interests. Commerce, manufactures and trade concern the opulent or persons in easy circumstances, but the supply of food vitally concerns the struggling masses, upon whose labor the other interests are wholly dependent. Their labor is indispensable to the very existence of commerce, manufactures and trade, and their interests and wants are of as essential

importance, and are as worthy of the protection of government, as the others. The interests of an owner of a mill or factory do not require the sacrifice of this great public interest by strained construction or refined distinctions. Its regulation is manifestly as public in its character as many others that have always been under legislative control, and never challenged or even questioned.

We now come to the consideration of the effects and consequences of holding that private individuals may acquire prescriptive rights against the public. If such a doctrine were to obtain, it would amount to a repeal of this law. All the riparian owners on every stream in the State, and many others, could prove that they and their ancestors had, for more than twenty years, maintained weirs, and used seines, nets and other prohibited devices for the destruction of fish. If the claim of such prescriptive rights should be sustained, then all the fish in our streams would soon be destroyed, and the production of food decreased perhaps millions of dollars annually, and other food enhanced in price, so as to become oppressive to the poor and struggling masses,—and the question, for these reasons, will annually grow in importance with our unparalleled increase of population. No one has questioned the power of government to protect cattle, sheep and hogs from disease, or the power to pass and enforce restrictions for their preservation for food for the great mass of the people. This may not be so important an interest as either of the others, but there is no doubt it is of great public concern. The legislature has the power, and is charged with the duty, of passing all laws for the preservation of the people and their morals, and to adopt all measures for the general welfare, and this law is eminently adapted to produce such results. At the ancient common law it was regarded as within legislative power to prevent the forestalling, regrating and engrossing of food, and they were prohibited by statute, for the protection of the people against unjust exactions in the price of food.

If such were objects of legislation, then the preservation and increase of this article of food must necessarily be of great public, as contradistinguished from private, interest.

The act of 1857 does not possess a single ingredient of a charter for a corporation. It does not, in the remotest degree, refer to a corporation, or confer the slightest corporate powers or franchises, or anything which can be tortured into a grant of such franchises. If the courts may torture that act into a charter, or hold that plaintiff in error is a corporation, then it might be held that almost any law on the statute book is a charter, and creates a corporation. To so hold in this case would be to disregard all definitions, distinctions and relations of things. It surely is not expected that this or any other court could so hold. It is so palpable that the act is not a charter, it is useless to search for authorities, as no one before, we presume, ever conceived such an idea.

On thorough examination and earnest reflection, we are impelled to the conclusion that the General Assembly exercised legitimate and constitutional power in the adoption of the act of 1879, and did not thereby deprive plaintiff in error of any right of property or privilege. Nor did or could he acquire a prescriptive right against the public. We, for these reasons, conclude that this is one of the great purposes for which the State government was brought into existence, and the legislature has no competent authority to permanently grant or barter it away. That it may suspend the right, and license persons to create such nuisances, none can deny; but the license may be revoked at will, as the licensee acquires no vested rights under the license. This power can only be destroyed or withheld by the people when framing and adopting a constitution.

Perceiving no error in the record, the judgment of the court below is affirmed.

*Judgment affirmed.*

Mr. JUSTICE DICKEY, dissenting:

I can not concur in this judgment. It seems to me not only unjust, but an invasion of the rights of private property without warrant of law. The sanctity of the rights of private property is zealously guarded in all civilized communities, and these rights are shielded in this State by the provisions of our own constitution. This protection is one of the proudest features of our free institutions. I feel bound to protest that the constitutional barriers erected for their protection shall not be frittered away under any undefined idea of the omnipotence of the police power, or under any other guise.

I concede that this dam, when first erected, was a private nuisance, in so far as it did injury to the rights of riparian proprietors upon Fox river, above and below the dam, by obstructing the free passage of fish up and down the stream, and continued to be a private nuisance in this regard until, by the lapse of time, such use of the property by the owner of the dam, without question or objection by those whose rights alone were thereby injured, ripened into an adverse right, as against such riparian proprietors, to continue such use of his property. I think, that Fox river being in fact a strictly private river, the public never had any rights whatever as to the free passage of fish in that river, and hence this dam never was a *public* nuisance. The pivotal question of the case is, whether the obstruction of the passage of fish in Fox river was by law a *public* nuisance or merely a private nuisance, for it is clear, if it were a public nuisance no length of time could ripen the use into a right in the possessor; and it is equally clear that if this dam were originally merely a private nuisance, twenty years' uninterrupted use and occupation did ripen into a right as against all upper or lower riparian owners.

Our constitution declares private property shall not be taken or damaged for public use without just compensation. If, then, at the passage of the act of 1879, Parker, the plaintiff

in error, had a lawful right to maintain his dam in its then condition, although it did obstruct the passage of fish, such right was property, and being property, could not, without violation of the constitution, be taken or damaged without just compensation; and to deny him this right, except on condition that he should expend $600 of his own money in constructing a fishway for the benefit of the public or that of riparian proprietors above and below, would be to damage this right which is property. If, however, at the time of the act of 1879 the dam in question was a nuisance, either public or private, then Parker had not the lawful right to maintain the same in its then condition; and to provide that he should maintain it no longer, except upon the condition stated, would be a fit exercise of legislative power. This, in that case, would not deprive him of any lawful right of property, and would be no innovation upon any constitutional right. As already suggested, if originally this dam was a mere private nuisance, and not a public nuisance, by lapse of time the use and occupation of this dam has ripened into a lawful right in the owner to continue its maintenance, and it had thereby ceased to be a private nuisance. The right to maintain it, if not a public nuisance, had thus been added to his other rights as owner. See Wood on Nuisances, sec. 420; *Yard* v. *Ford*, 2 Saunders, 175, note 6; *Parker* v. *Foote*, 19 Wend. 309.

The right to maintain what originally was a private nuisance may be acquired by prescription or by grant. Hence, I say, the pivotal question in this case is, whether, by law, this dam was, or was not, a public nuisance, by reason of its obstruction of the passage of fish in the stream at that point. What, then, in a legal sense, is a nuisance? What is the difference between a private nuisance and a public nuisance? A nuisance is something done, or omitted to be done, which has the effect of injuriously and unwarrantably affecting the rights of another person or persons. All rights are personal. Some rights are public rights, and some are

private rights. Those rights which belong to a person *as one of the public,* are public rights. That, *only,* is a public nuisance which injuriously affects such right or rights of another as belong to him *as one of the public.* Those rights which belong specially and exclusively to a particular person are private rights. That is a private nuisance which injuriously affects such right or rights of another as especially belong to him exclusively, and do not belong to him as one of the public. All men have, as members of the public, a right to have the public highways free from obstruction to travel, and have the right to travel thereon. This is a public right. Every man who owns property abutting upon a highway has a right of access to and egress from his property from and to the highway. This is a private right. That is a private nuisance which injuriously and unwarrantably affects such rights of another as belong to him specially and exclusively. The right to take fish in the sea or in tide waters is a right which belongs to every man as one of the public,— hence that is a public nuisance which injuriously and unwarrantably affects that right. The right to take fish in the waters of rivers and streams where the tide does not ebb and flow, is exclusively in the riparian proprietor over whose land the waters are flowing,—hence that which injuriously and unwarrantably affects that right is a private nuisance. One committing a private nuisance is liable to the person whose private rights are injured, in a private action. A public nuisance subjects the offender to indictment. The same thing unlawfully done may sometimes be a public nuisance and also a private nuisance. Should one construct a house in a street in a city, large enough to occupy the whole breadth of the street, and so situated as to obstruct access and egress between the street and the property of another abutting upon the street at that place, the offender would no doubt be liable to indictment for a public nuisance in obstructing the travel along the street, and thereby violating the rights of those

who, as members of the public, have the right to travel the highways; and for the same act such offender would be liable to a private action by the owner of the abutting property, for the violation of his private right of access and egress as owner or tenant of the abutting property.

Wood, in his excellent work on Nuisances, says that legally the term "nuisance" is applied to wrongs "which work an obstruction of or injury to *a right* of another, or of the public," (sec. 1, pp. 1, 2,) and that "every enjoyment by one of his own property which violates the rights of another, is in an essential degree a nuisance, and the use by the owner of his own property must be such as will not prejudicially affect the rights of others," and that such use must be "in recognition of and obedient to the rights of others." And in a note it is said, "that which is *lawful* can *never* be a nuisance,"— referring to *Lee* v. *Westerfeldt*, 2 Duer, 618, *Williams* v. *Railroad Co.* 18 Barb. 222, and *Renwick* v. *Merrick*, 7 Hill, 575. The author quotes from Smith's Manual on the Common Law, as follows: "A nuisance is something done which has the effect of prejudicing and unwarrantably affecting *the rights* of another person," and says: "If Smith had added, 'or something omitted to be done,' this definition would have been sufficiently comprehensive to *cover the subject and be complete.*" (Sec. 4, p. 6.) Again: "A nuisance is an obstruction of or injury to a right, * * * and unless the act or thing is in violation of a *right*, the act or thing is not a nuisance, and the party injured is remediless." (Sec. 9, p. 16.) And again: "The inconsistencies that have sometimes appeared in the judgments of courts when dealing with this branch of the law, have arisen * * * from a failure at all times to keep in view this fact: that there can be no *legal injury* except from the violation of a *legal right*." (Sec. 13, p. 21.) Again: "When no *right* has been violated, it can not, by any process of reasoning, be established there is a *legal injury;*" and "a public nuisance is a violation of a public right. * * *

A nuisance is only public when it affects the rights of citizens *as a part of the public.*" (P. 29.) And again, in stating the distinction between public and private nuisances, he says: "Private nuisances are confined to the injury of individual rights, while public nuisances affect the rights of individuals only as members of the public," (p. 77,)—referring to *Soltau* v. *De Held*, 2 Sim. (N. S.) 133; 9 Eng. L. & Eq. 104.

A dam erected so as to injure the land of another, above or below, is a private nuisance. (*Norway Plains Co.* v. *Bradley*, 12 N. H. 86.) A dam which impairs the health of the neighbors is a public nuisance, because each man, as of common right, is endowed with the right of having his health free from injury by the wrong of another. *Kownslar* v. *Ward*, Gil. (Va.) 127; *Rhodes* v. *Whitehead*, 27 Texas, 304.

Counsel for the People attempt to defend the validity of this act, as against the plaintiff in error, under what are called the police powers of government. It may be observed that the provision of our constitution protecting private property from being taken or damaged without just compensation, is *unconditional*. This is absolutely forbidden, and can not constitutionally be done under the police power or any other power. The police power, however, in my judgment, never did, when properly exercised, extend to or justify the taking away or damaging any right relating to private property. It extends to the protection of all *rights*, whether public or private, and to the enforcement of all duties which the citizen or property owner owes to other citizens as respects their private rights, as well as to the enforcement of all duties which the citizen or property owner owes to the public,—that is, owes to any other person, as respects the rights of such person as one of the public. My position is, that where there are no *rights* of others to be protected, and no duties in respect to the rights of others resting upon the owner of private property to be enforced, to such case the mere police power does not extend. If this limitation be sound, it follows that the

police power can never be invoked to justify the taking or damaging of private property, for no man can have a property right to violate the rights of others, or the right to omit the performance of any duty which he owes to others in respect of any of their rights.

Chief Justice SHAW has well said of the police power of government, (7 Cush. 85): "It is easier to perceive and realize the existence and source of this power than to mark its boundaries and prescribe limits to its exercise." He concedes, however, that it has limits. Cooley prescribes a limit, and says this power of the State "embraces its whole system of internal regulations made to preserve public order and to prevent offences against the State, and to establish those rules of good manners and good neighborhood which tend to prevent conflict of *rights*, and to *insure* to *each* the uninterrupted enjoyment of *his* own, so far as is reasonably consistent with a like enjoyment of *rights* by others." (Cooley's Const. Lim. 572.) The right to exercise this power, at least in so far as regards the *protection of the private rights* of others, is usually said to rest upon the fundamental doctrine of all civilized men, that each must so use his own as not to injure others. Chief Justice SHAW places it upon this ground. (*Commonwealth* v. *Alger*, 7 Cush. 53.) Redfield bases this power upon the same doctrine,—*sic utere tuo ut alienum non lædas*,—and says: "It is within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure another." (*Thorpe* v. *Rutland and B. R. R. Co.* 27 Vt. 140.) Cooley, speaking of this maxim as the foundation of the police power, says: "The maxim is that which lies at the foundation of the power; and to whatever enactment affecting the management and business of private corporations it can not *fairly* be applied, *the power itself will not extend.*" And so, where a corporation, by its charter, had the right to take toll from passengers over its road, a subsequent statute authorizing a certain class of persons to go toll free,

was held void, and the author aptly says: "This was not a regulation of *existing rights*, but it took from the corporation that which they before possessed,   \*   \*   \*   and conferred upon individuals that which before they had not." (Id. 578.) And so an amendment of the charter of a bridge company, requiring a fifty-two-foot draw for the passage of vessels instead of one of thirty-two feet required by the charter, was held not within the police power, and to be unconstitutional. (18 Conn. 53.)

What is said by Cooley as to the rights of corporations seems equally applicable to the property rights of private citizens, for surely the rights of corporations are no more sacred than those of the citizens. If so, adopting the apt words of Cooley, we may say, this maxim is that which lies at the bottom of the power, and to whatever enactment affecting the property rights of the private citizen it can not fairly be applied, the power itself will not extend. It seems to me it may be safely laid down as a rule, that all police regulations made by statute *affecting injuriously the rights of private property*, to be valid must be for the protection of some *existing right*, public or private, and for the enforcement of *some duty* in respect to such existing rights, either to the public, as such, or to private individuals; and when no such rights are involved, and no such duty is found, the mere police power of the State *does not extend to the case*. On this principle, statutes requiring railroad corporations to fence their existing tracks are sustained. To use their own so as not to injure adjoining proprietors by endangering their cattle by reason of such use, was a duty resting upon the corporation; and to guard their passengers from danger arising from cattle straying upon the track, was a duty resting upon the corporation. The police power aptly prescribes the mode in which these duties shall be performed. Upon this principle, existing railway companies are required to ring a bell or blow a whistle at highway crossings, and to stop their trains at intersections

with other railroads, and to keep a flagman at specified dangerous places. Upon the same ground, statutes regulating or restraining the sale of dangerous drugs are held valid. Under this power, carriers of persons may be made insurers of the safety of their passengers, quarantine and health regulations have been made, and regulations as to harbors, pilots, quiet deportment on Sunday, as to fire limits in cities, as to location of slaughter-houses, as to places of deposit for gunpowder, as to the inspection of provisions, the keeping of dogs, as to markets, and relating to many other subjects. Under this power, laws are passed imposing penalties for cutting trees on another's land, and for permitting Canada thistles and other noxious weeds to go to seed on the owner's land. Other illustrations might be named. Some of these are for the enforcement of duties to the public, or to others as members of the public, and some for the enforcement of duties to citizens, and for the protection of strictly private rights; but each of all such regulations, in so far as they prescribe what a man may or may not do as to the use of his own property, is simply for the enforcement of the maxim, "So use your own as not to injure another,"—or, in the language of Chief Justice SHAW, (7 Cush. 84) : "Every holder of property, however absolute and unqualified may be his right, holds it under the implied liability that his use may be so regulated that it shall not be injurious to the equal enjoyment of others having equal *right* to the enjoyment of their property, nor injurious to the *rights* of the community." Observe, he speaks of the *rights* of others, and the *rights* of the community. He does not merely speak of the *interests* of others, or of the interests of the community at large. Nor do we find either any general proposition laid down, or any illustration given, by any of the various authors and jurists, as showing what is a proper subject of the police power, which is not in full harmony with the proposition that it is essential to the validity of every statute resting *solely* upon what is called the police

power, that it must be passed in protection or furtherance of some right, public or private, and to enforce some duty to the public or to private persons. Where such rights and duties are involved, it is competent for the law-making power to prescribe the mode in which the end shall be accomplished. This is within the functions of legitimate legislation, for no man can hold as property a right to maintain a nuisance, public or private. Whether the obstruction of the passage of fish, by this dam, was ever a nuisance, must depend upon whether, under the laws of Illinois, this obstruction violated any rights of any other person or persons, and upon the nature of the rights violated, if any,—whether mere private rights, or rights possessed by others as a part of the public, must depend the question whether such nuisance was private or public. To determine these questions we must examine the law as to the rights of persons in relation to fish in such rivers.

It is conceded the common law of England is the law of Illinois, except in so far as modified by the early English statutes, or by acts of our own legislature. As to the common law affecting these questions, Lord Hale's "De Jure Maris" is everywhere recognized as unquestionable authority. It is there said: "There be some streams and rivers that be private, not only in propriety and ownership, but *in use,* as, the little streams or rivers that are not a common passage for the king's people. There be other rivers, as well fresh as salt, that are common or public for the carriage of boats and lighters, and these, whether they are fresh or salt, whether they flow or reflow, or not, are *prima facie publici juris,*— common highways for a man or goods, or both, from one inland town to another. Thus, the rivers of the Wey, of the Severn, of the Thames, and divers others,   *   *   *   as well above the flowing of the sea as below, and as well where they are become private property, *are public* rivers, *juris publici,* and therefore all nuisances and impediments of passage of

*boats and vessels*, though' in the private soil of any person, may be punished by indictment, and removed." And again he says : "Fresh rivers, of what kind soever, do, of common right, belong to the owners of the soil adjacent, so that * * * if a man be owner of the land on both sides, in common presumption he is the owner of the whole river, and hath *the right of fishing* according to the extent of his land in length." Blackstone, speaking of a "several fishery," which is the exclusive right to take or kill fish in a fresh stream, says it "is in or derived from the owner of the soil." Book 1, page 39.

It has been held by this court, again and again, that the property of the owner of land bounded by a fresh stream extends to the thread of the stream, and if one owns the land on both sides of such stream, he thereby owns the entire bed of the stream at that point. (3 Scam. 510; 11 Ill. 554; 47 id. 384; 49 id. 172; 51 id. 226; 64 id. 488; 75 id. 41; 82 id. 179.) That such ownership in Illinois carries with it the exclusive right of taking fish in all fresh rivers, (and we have none other,) has also been established by the adjudications of this court. In *Beckman* v. *Kreamer*, 43 Ill. 447, this court said, speaking by Mr. Justice BREESE : "By the common law, a right to take fish belongs so essentially to the right of soil in streams where the tide does not ebb and flow, that if the riparian proprietor owns ,on both sides of. such stream, *no one but himself* may come upon the limits of his land and take fish there. * * * Within these limits, by the common law, his right of fishery is *sole and exclusive*, unless restricted by some local law or well established usage of the State where the premises may be situate. * * * The right to take fish within the limits of one's own land * * * is so far a subject of distinct property or ownership, that it may be granted as a separate and distinct property from the freehold of the land, or the land may be granted whilst the grantor reserves the fishery to himself." Again, in *Washington Ice*

39—111 ILL.

*Co.* v. *Shortall,* 101 Ill. 51, where the question was as to the ownership of the ice formed in a fresh stream, this court, by Mr. Justice SHELDON, said: "By the common law, only arms of the sea, and streams where the tide ebbs and flows, are regarded as navigable. The stream above the tide, although it may be navigable in fact, belongs to the riparian proprietors on each side of it to its center, and the *only right* the public has therein is an easement for the purpose of navigation." And in another part of the opinion it is said, there is much reason "to allow to the riparian owner the same right to take ice as to take fish, which latter is an *exclusive right in such owner.*" If this court is prepared to overrule these decisions, and declare that the common law relating to such exclusive right in the riparian proprietor is not the law of Illinois, then I grant that the conclusion reached by the court in this case is logical, and that my reasoning is without foundation. If, however, these decisions are to stand, and the common law in this regard is to be held in force here, it seems to me this decision can not be logically defended.

The authorities as to what the common law is in this regard are in absolute harmony in England and America. In the case of *Commonwealth* v. *Chapin,* 5 Pick. 199, it was expressly decided that in all rivers where the tide does not ebb and flow, by the common law the proprietor of the adjoining soil has the exclusive right of fishing in front of his land to the thread of the stream, and an indictment at common law would not lie for the obstruction of passage of fish in such a river by a dam, and that such an obstruction was not, at common law, a public nuisance. This is also declared to be the common law, by the same court, in *Vinton* v. *Welsh,* 9 Pick. 87. To these two cases I will hereafter refer for another purpose. In *People* v. *Platt,* 17 Johns. 195, and in *Hooker* v. *Cummings,* 20 id. 90, the same doctrine is declared. In fact, it is elementary that by the common law rivers were divided into

three classes :   First, rivers where the tide ebbs and flows;
second, rivers susceptible of useful navigation, where the tide
does not ebb and flow; and third, rivers not susceptible of use
for navigation, and where there is no tide.   The first class
are essentially public rivers.   They, only, are called navi-
gable, at common law.   The title to the bed of such rivers
was in the sovereign, and this carried with it, technically,
the title or right to take fish therein.   This right, so far as
concerned royal fish, (whales, porpoises and sturgeon,) was
held by the sovereign for his own revenues, and so far as·
concerned all fish not royal, and in tide waters, was said to
be in the king, in trust for all his subjects.   So royal fish,
when taken, were the property of the crown, by whomsoever
taken; but fish not royal, taken in tide waters, became the
property of the takers.   Each subject, as one of the public,
had a common right to take fish in tide waters.   But as to
fresh streams, whether susceptible of useful navigation or
not, the title to the bed of the stream was, as we have seen,
in the respective owners of the adjacent land, and to them,
respectively, belonged the exclusive right of taking fish in
such streams.   (See, also, Angell on Water-courses, sec. 61.)
In fresh rivers susceptible of useful navigation, the public
had a right of way for such navigation, as a highway by
water; but this in no manner affected the right to take fish
in such streams.   That right was ever a private right, rest-
ing in the respective owners of the soil adjacent, or those
deriving right from them, respectively.   This has ever been
the law of Illinois.   No man, merely as one of the public,
ever had a lawful right to take fish in any river or stream in
the State of Illinois.   If this be so, it can not, in my judg-
ment, be properly said that the fish in such streams belong
to the community collectively, or that in this regard there is
a general ownership, or that the fish in our rivers are a com-
mon inheritance or a common heritage.   I know of no war-
rant in reason or authority for so saying, or for saying that

belonging *to all*, they should be protected for all. If any such *common right* to take fish in our streams had, under our law, *any existence*, then, indeed, would I concede that to obstruct the free passage of fish in our rivers does constitute a *public nuisance*. It is equally plain that where no one, as a mere member of the public, has right to take fish, and where that right is exclusively in the riparian owner as a private right, whatever impairs such right is not a public nuisance, but a private nuisance.

It is said fish in streams are incapable of individual ownership. This is true in a strict technical sense, for fish in streams, until taken, are incapable of ownership at all. They are just as incapable of ownership by the king or by the public, so long as they are at large, as they are incapable of individual ownership. It is the lawful right to take such fish, and thus acquire the ownership, that is meant when the ownership of fish is spoken of, although the expression is not strictly accurate. *That right* is capable of having an individual owner, as we have seen.

It seems to be thought the obstruction of the passage of fish must be a public nuisance, because parliament and the legislatures of our States have, from time immemorial, passed statutes regulating the manner in which, the time when, and the extent to which the riparian owner may take fish in fresh streams, even upon his own land, and that the recognized validity of such statutes shows that "the community" have a *common ownership* in such fish, and that such statutes are passed necessarily to preserve "the common property," and that the existence of such legislation, and legislation for the preservation of fish, not only show the same to be "a proper subject of legislation and a matter of public concern," but distinguishes the rights in question "from a mere private right not within the dominion of legislation." This seems to me a radical misconception. It is not the law that private rights are not the fit subjects of legislation. All these

statutes are for the protection of the private rights of other riparian proprietors, and properly so. While each riparian proprietor has the exclusive right to take fish in that part of a fresh stream passing over his own land, yet he must exercise that right so as not to impair the like rights of other riparian owners above and below his land; and to this end fishing with seines, or in any mode or time calculated to destroy the supply of fish, or to prevent fish from passing from his land to that of others, may properly be prohibited by statute. This in no sense recognizes any public right, for we have seen it is the unquestionable law that no man, as one of the public, has any right, at common law, to take fish in such streams. That right can come only from the owner of the soil. In *Hooker* v. *Cummings*, 20 Johns. 101, where a like suggestion was made, Chief Justice Spencer said: "Counsel lay some stress upon statutes regulating fishing. * * * These acts prove nothing, for the legislature confessedly have the right of regulating the right of taking fish in private rivers."

I do not doubt that it is a legislative function to regulate the taking of fish in the waters of the State, and make provision for their preservation and for their increase, and to prohibit obstructions to the free passage of fish; nor do I question that it is appropriate exercise of the power of legislation by the State to protect the rights of each and all, in so far as they have rights relating to fish in our rivers, and in so far as they have *rights* relating to any other subject matter,—and this whether such rights are private rights or public rights; and where there are any rights of any citizen to be protected thereby, I do not deny the power of the legislature to regulate the mode and time of taking fish in our streams,—and this whether the rights to be thus protected be private rights or public rights. The mere fact that the English parliament and our State legislatures have the power, and have ever exercised the same, to legislate against the erection of

obstructions to the free passage of fish in streams, does not prove, or tend to prove, that the rights to be protected thereby are necessarily *public* rights, and that they are thereby distinguished from mere private rights.    The protection of private rights is a matter as much within the domain of legislative power as is the protection of *public* rights.    The legislature, under its mere police powers, has undoubtedly the constitutional authority to require any citizen maintaining a nuisance, whether public or private, to abate the same at his own expense, and to prescribe the manner in which that duty shall be performed, and also to enforce the performance of such duty by the imposition of penalties for its non-performance,— and all this because no man can hold as property a right to maintain that which is a nuisance, either private or public.

Again, it is suggested that game, and fish in our rivers, stand upon the same footing, to the fact that this court, in *Magner* v. *The People*, 97 Ill. 320, speaking of game, said, that whilst it remains at large, the ownership (by which was meant the lawful right to take or kill) is in the sovereign authority, and hence no individual having any property rights to be affected, the legislature may withhold or grant to individuals the right to hunt and kill game.    And from this it is insisted we must now hold that the ownership in relation to fish in our rivers is in the sovereign authority,—that is, in the State,—and hence any invasion of that ownership must be held to be a public nuisance.    The error which is the foundation of this suggestion consists in the idea that game, and fish in fresh rivers, at common law, stood upon the same footing.    At the common law, the doctrine of *title in the sovereign*, applies to game, wild fowl and royal fish, as a royal prerogative, (or as what may be called the private property of the king,) and applies to fish (not royal) in the sea and tide waters, and as to such fish the title was said to be in the king for the use of the public; but this doctrine never had any application to fish in streams in which the tide did

not ebb and flow. Blackstone, in his Commentaries, says, the beasts of chase or venary replenish the forests, and are under the king's protection, for the sake of his royal recreation and delight. (Book 1, p. 289.) And again, enumerating franchises which may be derived by the subject from the crown, the author mentions as such, "to have a forest, chase, park, warren or fishery, endowed with the privileges of royalty." (Book 2, p. 28.) It elsewhere appears that the fishery here mentioned relates to taking fish at sea or in tide waters. The author says a chase is "a liberty of keeping beasts of chase or royal game, protected even from the owner of the land, with power of hunting them thereon." And again : "Nor is every inclosure with deer in it, a legal park, for the king's grant is necessary to make it so ;" and the author adds, "it is unlawful, at common law, for any person to kill any beasts of parks or chase, except as they possess these franchises." And on the next page (39) we are told : "No man, not even the lord of the manor, could, by common law, justify sporting upon another's soil, or even on his own, unless he had the liberty of free warren, which was a franchise granted by the king." And so of a free fishery, (which is an exclusive right of fishing in some part of the sea bordering upon the realm, or in a river where there is tide,) he says, "it exists only by grant from the king." (Book 2, p. 411.) It is quite otherwise as to a several fishery, which the author declares "is in or derived from the owner of the soil," a several fishery being the "exclusive right of the owner of the soil," or some one claiming under him, to take and kill fish in a private river on the land of such owner. (Book 1, p. 39.) And so the same author, in book 2, page 409, speaking of chattels vested in the crown, and not derived from any former proprietor, mentions "the acquisition of property in waifs, in royal fish, in swans, and the like." And on page 415 it is seen this royal right to all game has been recognized since the Norman conquest, and in pursuance of the same principle

the rule was soon after extended to winged as well as four-footed creatures. (Page 416.) And on page 417 we are told, "as to all inferior species of game, the liberty of killing them is a franchise of royalty,"—and so was a free fishery, which was the exclusive right to take fish in certain parts of the sea or tide waters; but by Magna Charta no new franchises "of the latter class could be granted," and the author says: "In thorough strictness of the common law, no man, without a franchise from the king, could justify hunting or sporting at all." Plainly, the law relating to game can have no relation to the questions under discussion.

As showing that this dam was, at common law, a public nuisance, great reliance is placed upon the provisions of Magna Charta, wherein it is said, "all kydells (weirs) for the future shall be quite removed out of the Thames and the Medway, and through all England, except on the sea coast." And again, when it is declared, among other thing, that "all water banks and their keepers shall be immediately inquired into, * * * and within forty days after inquisition is made they shall be altogether destroyed, never to be restored," and upon the early British statutes (adopted here with the common law) in relation to weirs and embankments. These provisions of Magna Charta and the early statutes plainly related to streams navigable at common law, and had no reference whatever to private rivers. Magna Charta contains *only* concessions from the *crown* to the subjects. Although the king held the title to the sea, and to all estuaries and tide rivers, which were regarded as arms of the sea or parts of the sea, it had always been regarded, at common law, that he held such title in trust for the use of his subjects, and that they enjoyed, as of common right, the right to take fish (except royal fish) on the sea shore and in *such rivers*. Before the time of Magna Charta, the kings of England had encroached upon the rights of their subjects in this regard, by granting to their favorites the exclusive right of fishing

on certain parts of the coast and also in certain parts of tide waters, and had also authorized certain of their favorites to encroach upon the sea coast and on the shores of tide waters, by what were called embankments. Now, it was against these usurpations of the crown,—these encroachments upon the rights of the subjects, enjoyed by them in common,—that these provisions of Magna Charta and of these early statutes were aimed. We are not aware that the king had ever assumed the right or power to grant to any of his favorites the right to take fish in rivers not navigable, or the right to encroach upon such rivers by embankments. These rights were always, in England, exclusively the property of the owners of the land abutting against such rivers. In fact, the provisions of Magna Charta may be read from beginning to end, and nothing can be found therein in the nature of a limitation upon the rights of the riparian proprietors on fresh rivers. Thomson, in his Essay on Magna Charta, (page 214,) says of this provision as to the destruction of kydells or weirs, found in Magna Charta: "The intent of this brief fragment of the old common law was to prevent any persons from appropriating to themselves a fishery in any part of the river Thames, which was common property, and thereby committing a purpresture." This shows that Thomson understood this provision as applying only to rivers navigable at common law, for there was no "common right" in the people of Great Britain to fish in fresh rivers, and a purpresture is confined entirely in its application to encroachments upon the sea and upon tide rivers. A purpresture is a violation of a private right "of the crown." (Wood on Nuisances, sec. 604, p. 637.) Wood teaches that Magna Charta, in this regard, relates only to tide rivers, and says: "The purpose of Magna Charta was to prevent the king, because of his ownership of the bed of the sea within certain limits, and of the branches of the sea, from imposing unreasonable restrictions upon its use by the people. In fresh water streams the king was not

the owner of the alveus of the stream, and could not impose restrictions which, the court could not control, therefore no necessity existed for any provision thereto." (Sec. 577, p. 609.) "All such streams were regarded as private property for all purposes, except as highways for commerce." (Sec. 578.) Callis, in his work on Sewers, prepared in 1622, after a careful discussion of the provisions of Magna Charta and these early British statutes, expressly declares that they extended *only* to streams deemed navigable at the common law. (Page 259.) And he quotes a decision made by Chief Justices FLEMING and COKE, and Chief Baron TANFIELD, (found in the 10th report of Sir Edward Coke,) in which these three distinguished jurists concur in holding that the general words of Magna Charta in this regard, were restrained by the statutes of 25th Edward III and 45th Edward III, and limited to streams deemed navigable at common law. (Page 260.)

Great reliance is also placed upon what Lord ELLENBOROUGH said in *Weld* v. *Hornby,*—found in 7 East, 195, and also in 3 Smith's Rep. 244,—and it is *assumed* that he intended there to be understood as speaking of an obstruction located in a fresh river. This is plainly a misapprehension. In Smith's Reports the syllabus of the case is: "A prescription or grant of a fishery can not authorize the erecting of a weir entirely across a *public* river, whereby the passage of all fish shall be prevented, for that is *prima facie* a *public nuisance*." Lord ELLENBOROUGH, in Smith's Reports, is said to have referred to Hargrave's notes to Lord COKE's 1st Institute, 122, (A. N. 7.) That authority has no reference to an obstruction in a fresh river. It is therefore unreasonable and unwarrantable to assume that so great a jurist as Lord ELLENBOROUGH could have intended to say that every man, as of common right, had in England the right to fish in a fresh river, or that a dam in a fresh river, by impairing a mere private right, constituted a public nuisance. It is not exactly accurate, either, to say that the views of Lord ELLENBOROUGH, expressed in

that case have been overruled in more recent cases in England. In the cases referred to, the language of Lord ELLEN-BOROUGH is *explained* upon the ground that it was used by him in regard to what he must have regarded a tide river. It is only the inference sought to be drawn from his language which is condemned. In fact, the language is that of the reporters, and not that of the jurist.

This view does not, however, rest upon the mere strength of the reasons and authorities above. Cases very like in principle with the case at bar, and in which the very questions were involved, have been decided in England,—one in 1868, and the other in 1870. In the case of *Rolle* v. *Whyte*, 3 L. R. Q. B. 286, the complaint was against the owner of a dam in the river Taw, by which the passage of fish was prevented at a point where there was no tide. The defence, as in the case at bar, was that of an easement acquired by prescription. It was answered, the obstruction was a public nuisance, for which a man may not claim by prescription. The court sustained the defence, and held that the act of 12th Edward IV, as well as Magna Charta and the statutes which preceded this statute on the subject of weirs, had relation solely to rivers navigable at common law, saying: "It is true Magna Charta speaks generally of weirs, but the key to the meaning is in the statute of 25th Edward III, St. 4, C. 4, and it means the great navigable rivers." And in support of this view all the statutes of England bearing upon the subject are quoted and examined, and reference is also made to Callis on Sewers, page 259. In regard to fish, the court said: "Inasmuch as the public generally have a right to fish in navigable rivers, the destruction of the fry by means of weirs in such rivers was matter of public concern, and became a fit subject for imperial legislation; but as to other rivers, the riparian owners alone were entitled to take fish,—and as appears in *Weld* v. *Hornby*, could prevent any interference with the general rights of the riparian proprietors by

action. There was no necessity, in the case of such rivers, for statutory protection. The idea of prohibiting easements which might otherwise be lawfully acquired, and thus to interfere with the private rights in order to secure to the public a large supply of an article of food, does not appear to have occurred to our earlier legislators. * * * It seems to us clear, such an easement may be acquired in private rivers by grant from other riparian owners, or by enjoyment, or, in short, by any means by which such rights may be constituted."

In 1870 the same question came before the Court of Common Pleas in England, in the case of *Leconfield* v. *Lonsdale*, 5 L. R. C. P. 657, in which it was again held that the provisions of Magna Charta, and all the earlier statutes which prohibited weirs, applied only to navigable rivers. The case of *Rolle* v. *Whyte, supra*, is reviewed, and the decision there approved, and it was therein declared that a fishing mill dam in a river not navigable at common law, was not a public nuisance; and it was further held that the grant of an easement to maintain a dam, by evidence of enjoyment, consistent only with the existence of such a grant, and where the owner of the dam upon such stream had maintained it for more than twenty years, the law inferred a grant "from all proprietors whose interests could be affected by the dam," and hence such a dam was lawfully in use. That court was urged to disregard the ruling in *Rolle* v. *Whyte*, and rule otherwise. The language of Lord Ellenborough, in *Weld* v. *Hornby*, was pressed upon the attention of the court, as authority showing that such a dam in a fresh stream was a public nuisance. The whole subject was fully argued and considered with great care, and the ruling in *Rolle* v. *Whyte* fully approved and affirmed. That case, like this, was a proceeding under a statute wherein fish commissioners were endowed with statutory powers to require fishways in all dams where such burden could lawfully be imposed, and the question was,

whether this dam was one which was an unlawful dam, and came within these powers. In delivering the opinion of the court, (in which all the judges concur,) BOVILL, Ch. J., says: "The first question which arises is, whether the provisions of Magna Charta, and the other early statutes which were relied upon as prohibiting weirs, were confined to navigable rivers, and that point was elaborately argued before us, and.is discussed at large by the fishery commissioners in their judgment. We have carefully considered this point, and concur in the opinion expressed by the Court of Queen's Bench, that these statutes relate to navigable rivers only, and for the reasons which are fully stated in the judgment in the Court of Queen's Bench, and which it is therefore unnecessary to repeat. In addition to the passage cited from Callis on Sewers, 259, which the Court of Queen's Bench considered of great weight, there is the higher and weightier authority of Lord COKE citing a passage from Glanville, in the 2d Institute, to show that the enactment of Magna Charta applied only to public rivers. If it were otherwise, there would have been a prohibition against erecting weirs in all private rivers, even where a person was the owner of the entire river and of the land on both banks, which, we think, could not have been intended. * * * We think it may also be collected from the observations of Lord HALE in his treatise De Jure Maris, that his view of the early statutes was the same as Lord COKE and Callis took of them. * * * The weir in this case was in a part of the river above the flow of the tide, and where it was not navigable; and we are of opinion that the use of the weir is not shown to have been unlawful by force of any statute at the time of the passing of the Salmon Fishery act, in 1861. It was contended, that independently of any statute, the erecting of a coop of the present description, without any gap or opening in the dam to allow fish to pass, was a public nuisance; but we see no ground for saying that a coop which is not in a public navigable river can be

treated as a nuisance. The supposed authorities which were cited do not appear to us to make out any such proposition, and the passage in the 2d Institute involves the contrary. The case of *Weld* v. *Hornby*, which was relied upon on this point, did not raise any such question. It was an action for a private nuisance, and unquestionably maintainable in respect of the plaintiff's private right of property, which was injured by the act of the defendant in making his weir more impervious to fish, and so preventing them from arriving at the plaintiff's fishery,—a grievance long recognized as giving a right of action, independent of any question of public nuisance. The dictum of Ellenborough *must be read as assuming that the river was public*, and the marginal note to the report of the case in 3 Smith, 244, expressly refers to it as a public river. * * * The dictum was unnecessary to the decision of the case, and is outweighed by the authority of Coke and Glanville. At the same time, it is proper to observe that the opinion thus extra-judicially thrown out has led to much misapprehension, which even the judgment of the Court of Queen's Bench in *Rolle* v. *Whyte* does not appear to have quite corrected. The passage cited from Viner's Abridgment, title 'Nuisance,' 3, was clearly also a case of injury to a private right. * * * A grant may be proved either by production of the grant itself, or by evidence of enjoyment, consistent only with the existence of such a grant, and from which it may be presumed."

That the provisions of Magna Charta, and the statutes of Edward III, relate solely to weirs in tide waters, is therefore established, not only by the logic of the matter, but by the authority of Callis, Coke and Fleming, Tanfield, Thomson and Wood. When we add to these authorities these two decisions, (one in the Queen's Bench and one in the Common Pleas,) in which the words of Lord Ellenborough are explained, it seems to me the position is well sustained.

Reliance is also placed upon the language of PARSONS, Ch. J., in the case of *Stoughton* v. *Baker*, 4 Mass. 522. This authority clearly can have no application here. The law of Illinois on this subject is the common law of England. In Massachusetts, at a very early day, and before the rights of private property had accrued, this common law was so modified as to give the public rights in fisheries in fresh waters, which did not exist at common law. Some of these modifications were made by ancient ordinances, still extant. Others are evidenced by usages from time out of mind, recognized by the decisions of their courts. The principle upon which *Stoughton* v. *Baker* was decided, is founded expressly on early local law, and is at variance with the common law. By the law of Massachusetts, on tide waters the land of the adjoining proprietor extends to low tide, instead of being limited to high tide, as at common law, and the public not only had right to fish in such waters as at common law were navigable, but had right to pass over the land of the riparian owner for that purpose, not treading down his corn. So the right to take fish in fresh rivers and ponds in that State, is held to be a common right in the public, so long as the fishing right of the owner was not injuriously affected. This latter is very distinctly shown in that very case, where PARSONS, Ch. J., speaks of such fishing "as free fishery," and as common to "all the people." It is declared that by these ancient usages the rights of the owners of even ancient mills are subject to an implied limitation that a reasonably sufficient fishway shall be provided for the passage of fish, and that such limitation may be waived by a grant from the government. Now, it is plain that in Massachusetts the right of the riparian owner to take fish was, as in this State, absolutely exclusive. He might demand of the owner of the offending dam a reasonable fishway, and the State would have no power to waive this right for him. It logically follows, in that State, from the position that the public have these rights unknown to the

common law, that an obstruction to the passage of fish in a
fresh river in that State, in so far as it affected this common
right, was a public nuisance.

Again, in *Commonwealth* v. *Chapin*, 5 Pick. 199, (which was
an indictment at common law, charging the obstructing the
free passage of fish in a fresh river in Massachusetts by
means of a dam, and thereby committing a public nuisance,)
the indictment did not say "contrary to the statute," or by
any other words rely upon any statute. It was there held
that at common law this was not a public nuisance, and that
indictment was accordingly quashed. It is said in the opinion
that "the common law had been essentially altered" in that
State, by early legislative action as to the rights of the citi-
zens of that commonwealth, and as to penalties for violating
*public* rights founded upon the ancient usages of the colony;
but these penalties must be enforced under the statute, and
not by indictment for a public nuisance at common law. The
case of *Vinton* v. *Welsh*, 9 Pick. 87, shows the same line of
thought. The report shows, that by a statute of Massachu-
setts the right of fishing in any river of that State, within the
bounds of any town, was granted to the inhabitants of the
town through which the stream passed. It was insisted that
fisheries in fresh rivers belonged to the owners of the adjoin-
ing banks, and hence the legislature had no constitutional
power to divest them of this right and vest the franchise in
the inhabitants of the town. PARSONS, Ch. J., delivering the
opinion of the court, said: "*Upon principles of the English
common law the argument is well founded,* but the constant
course of legislation upon this subject, from the first settle-
ment of the country, has qualified this right so far as to sub-
ject the same to the control of the legislature, in the manner
and to the extent it has been immemorially exercised." The
constitution of Massachusetts was not like ours in that regard.
It must be plain that the decisions of Massachusetts as to
law which their courts declare to be local, can be no guide to

us, who are governed by the common law, and especially as the Massachusetts courts expressly declare that by the English common law the rule is otherwise.

Without following this law of decisions further, it is sufficient to say that in Maine, and some of the later New England States, their laws were derived from Massachusetts, and the common law in this regard was never in force there, and that the Delaware and Susquehanna, and other large rivers, were treated as navigable rivers for all purposes,— hence the law in this regard, of such States, is not the law of Illinois.

I have found no case decided upon common law principles, wherein the view I present is not sustained. *The People* v. *Platt*, 17 Johns. 195, sustains my view. Platt had the title to a tract of land on the shore of lake Champlain, through which ran the Saranac river. At a point some seven miles above the mouth of the river, and on the land of Platt, was a natural fall in the river, so high and so abrupt that salmon could not pass, and never had passed, above this fall. In 1786, Platt erected a dam on his land, and across the Saranac river, near its mouth, which prevented salmon from passing into that stream. In 1801 a statute was passed in New York requiring the owners of all dams to alter the same so as to admit the passage of salmon into the waters above. Platt failed to alter his dam, and this was a criminal prosecution against him under that statute. It was there held, that having the title to the land on each side of the river, from its mouth to a point above which salmon never did go, he thereby, on principles of common law, acquired the exclusive right to take and kill salmon in that river, and that neither the public nor any one else had any right in the fishery in that river, and that the act in question, as against Platt, was inoperative and unconstitutional. The case of *Stoughton* v. *Baker* was relied upon by the prosecution, but it was properly disregarded, SPENCER, Ch. J., saying: "The opinion in that case

40—111 ILL.

is founded on the ancient and long continued usage of the general court of Massachusetts, and it is perfectly clear that the court proceeded on local usages and customs, and not upon the general and received doctrines of the common law." The case of *Woolever* v. *Stewart*, 36 Ohio St. 146, is directly in point, and sustains the view I present. That was an action brought against the owner of a mill dam of fifty years' standing, for his failure to comply with a statute of 1871, requiring him to pay the expense incurred by certain fish commissioners in constructing a fishway to enable fish to pass his dam. The Supreme Court of Ohio held that by prescription defendant had acquired a vested right, as against other riparian owners, to maintain his dam in its then condition, and that the right thus acquired could neither be destroyed nor impaired by mere legislation,—that whatever was the "obligation" resting upon such owner to keep a way open for the passage of fish to the waters above, it was for the benefit of the upper owners, and *for them only*, and if they suffered an adverse use to ripen into an adverse right, the right thus acquired was property, and could not be taken without compensation.

It seems unnecessary to refer to further authority, for I find none to the contrary which profess to rest on the common law of England.

It seems to be thought, however, that the act of the legislature, passed in 1840, declaring Fox river to be a "navigable stream," and that the same shall "be deemed and held to be a public highway," has some influence upon the question now being considered. I have been unable to find any adjudication, and I have been referred to none, defining the precise legal effect produced by the passage of a statute declaring a river to be navigable, which, in point of fact, is incapable of advantageous use for any purpose of navigation. In *Braxton* v. *Bressler*, 46 Ill. 490, Justice THORNTON, speaking in relation to a river which was in fact capable of advantageous use for some purposes of navigation, and in relation to a statute say-

ing that such rivers "shall be deemed to be and remain public highways," said for this court, on page 491: "The intention was that the river, navigable in fact, should be subject to the public easement; that the public should enjoy its free and uninterrupted navigation, unobstructed by dams, bridges or other structures which might materially impede its commerce. * * * This the public could possess without interference with the riparian owner, and the latter could have his right to the bed of the stream without any interference with the *jus publicum.*"

When it is considered that our constitution, from the first organization of the State, has provided that private property shall not be taken for public use without compensation, it is difficult to conceive that the passage of such a statute as that of 1840, can, by its mere force as a fiat, deprive any one of any private right of property which he enjoyed, at the time of its passage, in the bed of a stream which was *in fact* incapable of any kind of useful navigation. The land on Fox river, at the time of the passage of this act, was the property of the United States. In some sense this land was public land, because it belonged to the United States; but the interest of the United States in this land was that of proprietor, simply. The right of property of the United States in this land was the same, precisely, as the property right of any other land holder. It can hardly be that this statute of the State of Illinois, passed at that time, in view of that provision of our constitution, could have the effect of depriving the United States of any lawful right vested in that corporation as a proprietor of the land; and when, in 1842, the remote grantor of Parker, the plaintiff in error, acquired the fee simple title to this land from the United States, he acquired all the rights which were before that time vested in the United States as a land holder. And so the proprietors of the land on the banks of Fox river, above and below, who purchased the same from the United States, acquired all the property rights of the United States in

these lands,—a fee simple title, and all the private rights that that implies, and among them the exclusive right of taking fish in the river, upon the land so purchased. If there were any places in Fox river capable of application in any useful navigation, the public, by the common law, had a right of way over such parts of the river. This statute, in my judgment, merely declared the common law in that regard. Until there shall arise some need of use of this stream for navigation, the act can have no effect. The act seems merely declaratory of this common law doctrine. Viewed in the light of the facts as they existed in 1840, it seems impossible that the object of this act could have been more than here suggested. Its only purpose was to declare that if any part of Fox river should be found capable of useful navigation, the right of way for the public for such purposes should be preserved. At that time the State had erected and was maintaining a stone dam across Fox river, at Dayton, a short distance above the mouth of the river, from which water was to be drawn for a feeder to the canal. That dam completely obstructed the passage of fish, as well as boats, if any had attempted to pass. There was also, besides the dam in question in the case at bar, a dam at Milford, another at Bristol, another at Montgomery, another at Aurora, another at Batavia, another at Geneva, another at St. Charles, another at Elgin, and, I think, another at Dundee. All and each of these dams obstructed the passage of fish, and would have obstructed navigation if there had been any. It surely was not intended to declare each and all of these mill dams to be public nuisances, and subject the owners thereof to indictment if they continued to maintain the same. Besides all this, it is not shown that this dam ever did obstruct navigation. There never was any navigation at this point to be obstructed, and the mere fact that it has always obstructed the passage, does not show that navigation has not always been provided for. A dam with a lock for boats would be no obstruction to navigation, and yet

would prevent the passage of fish. Be this as it may, all that is claimed of this act is, that it placed this river on the same footing, in point of law, as that of a fresh river susceptible of useful navigation. What then? Such a statute does not affect this question. Plaintiff in error is not arraigned for an obstruction to navigation, but for an obstruction to fish. Can he be punished for not building a fishway, for the reason that he obstructed navigation? It is expressly declared in *Hooker* v. *Cummings, supra,* as to a fresh river susceptible of useful navigation, that the private rights of owners were thereby in *no other wise* affected than by the river being subject to public use as a highway, and that such rivers do "*not* so far belong to the public as to divest riparian owners of their exclusive right of fishery therein." Whether this river is to be regarded as thus navigable, does not affect the question.

Again, the record does not show that plaintiff in error obstructed navigation. There may be a lock in that dam which promotes, and does not obstruct, navigation. I doubt not, the truth is, this very dam makes a part of the river susceptible of some kind of navigation, where before no part was. By the invitation of the owner, (the United States,) through the preëmption laws, the builder of this dam had lawfully entered and was in the lawful possession of this river before the legislature of Illinois declared that Fox river should be deemed a highway and a navigable stream. Had an indictment been found against this remote grantor of the plaintiff in error, in 1841, after the passage of this act, and before he had purchased the land from the United States, charging him as guilty of a public nuisance in obstructing the free passage of fish, it surely would not have been entertained for a moment by any court in this State. After he had purchased the land, in 1842, and after the legislature had, in 1857, passed the statute authorizing him to build that dam higher, or to take it down and build a new one higher, (and this with-

out any provision as to the obstruction of fish,) had such an indictment been presented it would have seemed still more preposterous. No court in this State, high or low, would have hesitated for a moment in adjudging that the dam was lawfully placed there, and lawfully maintained there.

It seems to me there is no ground on which this obstruction can properly be pronounced a public nuisance. If not, was it in any other way unlawful when the act of 1879 came into force? Every right in land, or incident to the ownership of land, which may be lost by grant from the owner, or acquired by another through such grant, may also be lost or acquired by any facts from which the law will imply such a grant. The right to obstruct the passage of fish up or down a stream, as against the private right of a riparian proprietor, like the right to overflow the land of another by a dam in a stream, may be acquired by continued exercise of that right, unquestioned, for a term of years, which, under our Statute of Limitations, would ripen an adverse possession into a bar to entry by the holder of the paramount title. (Angell on Water-courses, secs. 208, 209; *Tracy* v. *Atherton*, 36 Vt. 510; *Leconfield* v. *Lonsdale*, 5 L. R. C. P. 657.) By the statute of this State that time is fixed at twenty years. It follows, that plaintiff in error, and those under whom he holds, having maintained the dam in question in its present condition continuously for more than twenty years, without question or objection, plaintiff in error had thereby acquired, before the act of 1879, as against all riparian proprietors, above and below, the right to obstruct the free passage of fish at that dam, as effectually as if the same had been released to plaintiff in error by grant from each and every one of them. He owes to them no duty in this regard. The case of *Leconfield* v. *Lonsdale*, *supra*, fully sustains this position.

The maintenance of this dam, then, neither violated private right nor public right. The public, as such, never had any right in these fisheries, and the riparian proprietors have

parted with theirs, to the extent of subjecting their property to the easement acquired by plaintiff in error, long before the passage of the statute. There was therefore no subject matter to which the mere police power could extend. Plaintiff in error, in this regard, owed no duty to the public, or to any private citizens. He was not doing any act in violation of any one's rights, public or private.

Plaintiff in error, then, at the passage of the act of 1879, had the full, absolute and unconditional right to maintain this dam in its then condition. This right was private property. That right could not be lawfully taken from him, or damaged, even to accomplish a public benefit, without compensation. To compel him, as a condition of enjoying this right, to expend $600 of his own money to construct a fishway, will be to damage that right,—hence, as against plaintiff in error, in this regard that statute was inoperative and unconstitutional. In the words of Cooley, it takes from him that which he had, and gives to the riparian proprietors, above and below, that which they had not.